## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, STATE OF ARIZONA,
STATE OF CALIFORNIA, STATE OF
DELAWARE, DISTRICT OF COLUMBIA, STATE
OF HAWAI'I, STATE OF ILLINOIS, STATE OF
MAINE, STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
PEOPLE OF THE STATE OF MICHIGAN, STATE
OF MINNESOTA, STATE OF NEVADA, STATE
OF NEW JERSEY, STATE OF NEW MEXICO,
STATE OF OREGON, and JOSH SHAPIRO, in his
official capacity as Governor of the Commonwealth
of Pennsylvania,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
EDUCATION; and LINDA McMAHON, in her
official capacity as Secretary of Education,

        Defendants.

Case No. 25-cv-2990

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      In late 2023 and early 2024, long after the federal government had declared that the COVID-19 pandemic was over, the United States Department of Education ("ED") granted Plaintiffs extensions of time to access hundreds of millions of dollars in funds previously awarded to them to combat the devastating and ongoing effects that the COVID-19 pandemic has had on students in grades K through 12 attending both public and private schools. This funding provides essential support for a wide range of critical education programs and services needed to address, among other things, the impact of lost instructional time; students' academic, social, and emotional

needs; the safety of school environments; and the disproportionate impact of the coronavirus on economically disadvantaged students, including homeless children and children in foster care.

2.    On Friday, March 28, 2025, at 5:03 pm, with no advance notice or warning, ED and Education Secretary McMahon abruptly and arbitrarily reversed course, notifying Plaintiffs by letter that as of 5:00 pm that day, ED had unilaterally rescinded extensions of time to liquidate grant funds previously approved by ED. The extensions had allowed Plaintiffs to continue accessing awarded funds—which have already been timely obligated before September 30, 2024, by Plaintiffs to vendors and programs—through *March 2026*. But through the rescission letter, Secretary McMahon and ED suddenly declared that the period for accessing the funds had already expired.

3.    ED's drastic and abrupt change in position triggered chaos for state education departments (referred to by ED as "state education agencies" or "SEAs") and local school districts (referred to by ED as "local education agencies" or "LEAs"). If the rescission action is not vacated and the approved extensions are not reinstated, key programs and services that address ongoing and emerging education needs of Plaintiffs' students and local school districts to combat the long-term effects of the pandemic will have to be dissolved or disbanded. State employees and contractors have been, and will continue to be, dismissed from their roles, along with the employees of businesses providing academic and other services in schools. The result of ED's rescission is a massive, unexpected funding gap that is causing serious harm to the public, cutting off vital education services, all to the detriment of the students whom Congress intended to benefit.

4.    The sole stated basis for Defendants' change in position on the extension approvals is that the funding for these grants was appropriated by Congress through a COVID-19 related law. According to Defendants, the extensions of time for drawing down on these vital funding awards

must be rescinded, because "the COVID pandemic [has already] ended," and therefore extending deadlines for COVID-related grants "is not consistent with the Department's priorities and thus not a worthwhile exercise of its discretion." March 28 Letter from Secretary McMahon to State Chiefs of Education, attached as Exhibit A ("Rescission Letter"). This bare statement in the Rescission Letter constituted the sum total of Defendants' analysis and explanation as to why ED's prior position was being abruptly reversed.

5.      The Rescission Letter—a final agency action rescinding the prior extension approvals and deeming the period for Plaintiffs to access their awarded funds to be already expired—is arbitrary and capricious in violation of the Administrative Procedure Act ("APA") because, among other reasons, it: (1) assumes, with no legal or factual support, that all appropriations in COVID-19 related laws were only intended for use during the declared public health emergency; (2) fails to provide a reasoned explanation for reversing the agency's prior determination that Plaintiffs had submitted sufficient justification and documentation to warrant granting extensions; (3) ignores the substantial reliance interests of Plaintiffs (and their local school districts, nonpublic schools, and contractors) and the tremendously harmful impact of immediately terminating without any advance warning the period within which they could draw upon hundreds of millions of dollars in congressionally appropriated funds midstream; (4) asserts that this funding was suddenly unnecessary due to the "end of the pandemic"—an event that formally occurred almost two years ago on May 11, 2023, well before ED approved Plaintiffs' extension requests; and (5) misapplies the criteria for considering extension requests.

6.      The Rescission Letter also exceeds Defendants' statutory and regulatory authority and is therefore contrary to law under the APA. The end of the COVID-19 pandemic is not a lawful basis to rescind the prior extension approvals. Defendants have never asserted, much less

demonstrated, any failure by Plaintiffs to satisfy the requirements for obtaining extensions of the periods for drawing on the funds, nor have they explained why justifications and documents previously submitted by Plaintiffs and determined by ED to be sufficient are now suddenly insufficient. Congress did not tie the availability of funds to the period of the public health emergency. Congress' clear intent—as expressed in the intended use of the ES funding to, among other things, help students make up for lost instruction time in the aftermath of the pandemic— demonstrates that the ES funds were to continue to be available post-pandemic. In contrast, in other contexts, Congress has taken action to rescind the appropriations when the federal government declared the pandemic to be over. *See, e.g.*, Fiscal Responsibility of Act of 2023. Public Law 118-5, Div. B, Title I (rescinding some appropriations after the pandemic was declared over while keeping others in place, including the funding at issue in this case).

7.     Defendants' abrupt rescission of the previously approved extensions has already caused substantial confusion and will result in immediate and devastating harm to Plaintiffs (and their local school districts, nonpublic schools, and contractors), their residents, and the public writ large. ED's action deprives Plaintiffs and their local school districts of the period of the approved extensions (through March 2026) to access hundreds of millions of dollars in critical education stabilization funding—funds on which Plaintiffs' and their local school districts' budgets depend. If the previously approved extensions are not restored, Plaintiffs will be unable to provide essential public education services for residents, pay direct student service providers and teachers, satisfy obligations to public and private partners, and carry on the important business of government to educate their residents' children.

8.     Accordingly, the State of New York, State of Arizona, State of California, State of Delaware, District of Columbia, State of Hawai'i, State of Illinois, State of Maine, State of

Maryland, Commonwealth of Massachusetts, People of the State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of Oregon, and Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania (collectively, "Plaintiffs") bring this action against Defendants ED and Education Secretary Linda McMahon seeking to: declare that the Rescission Letter violates the APA; vacate and set aside the Rescission Letter as an arbitrary and capricious final agency determination; reinstate ED's prior approvals of extensions through March 28, 2026; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Rescission Letter or otherwise modifying the prior extension approvals or the criteria under which payment requests were reviewed and approved prior to issuance of the Rescission Letter.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701–706.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of New York is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the Southern District of New York.

## PARTIES

**A.    Plaintiffs**

11.     The State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

12.    The State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

13.    The State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California. The Attorney General acts as the chief legal representative of the state and is authorized by the California state constitution, article V, section 13, to pursue this action.

14.    The State of Delaware is a sovereign state in the United States of America. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

15.    The District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Brian L. Schwalb.

16.    The State of Hawaiʻi is a sovereign state of the United States of America. Hawaiʻi is represented by Attorney General Anne Lopez, who is the chief law enforcement officer and chief legal officer of Hawaiʻi.

17.    The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney

General is authorized to represent the State's interests by the Illinois Constitution, article V, § 15. *See* 15 ILC 205-4.

18.     The State of Maine is a sovereign state of the United States of America.  Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

19.     The State of Maryland is a sovereign state in the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

20.     The Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state in the United States of America.  The Attorney General is the chief law officer of the Commonwealth and is authorized under Mass. Gen. Laws ch. 12, § 3, to pursue this action.

21.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

22.     The State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of Minnesota, who is the chief law enforcement officer of Minnesota and authorized to sue on the State's behalf.

23.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

24.    The State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Matthew Platkin, the Attorney General of New Jersey, who is the chief law enforcement officer of New Jersey and authorized to sue on the State's behalf.

25.    Plaintiff the State of New Mexico is a sovereign state of the United States. New Mexico is represented by Attorney General Raúl Torrez. The Attorney General is New Mexico's chief law enforcement officer and is authorized to pursue this action pursuant to N.M. Stat. Ann. § 8-5-2(B).

26.    The State of Oregon is a sovereign state in the United States of America. The State of Oregon is represented by Attorney General Dan Rayfield, who is the chief legal officer of the State of Oregon. Attorney General Rayfield is authorized by statute to file suit in federal court on behalf of the State of Oregon to protect the interests of the state. Or. Rev. Stat. § 180.060.

27.    Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2.  The Governor oversees all executive agencies in Pennsylvania, including the Pennsylvania Department of Education.

**B.    Defendants**

28.    Defendant the United States Department of Education is a cabinet agency within the executive branch of the United States government.

29.    Defendant Linda McMahon is Secretary of Education, and is the United States Department of Education's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 42 U.S.C. § 300u.

8

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

**A.    During the COVID-19 Pandemic, Congress Appropriated Substantial Funds to Strengthen Plaintiffs' Education Programs, Many of Which Were Not Tied to the Duration of the Public Health Emergency**

30.    During the COVID-19 pandemic, Congress enacted numerous major disaster relief laws that appropriated funds to respond to the nationwide health crisis and economic devastation, place the nation on a path to recovery once the pandemic had ended, and ensure that the nation was better prepared for future public health threats. Among these appropriations laws were the American Rescue Plan Act of 2021 ("ARP"), Pub. L. No. 117-2, 135 Stat. 4 (2021), enacted in March 2021, and the Coronavirus Response and Relief Supplemental Appropriations Act, 2021 ("CRRSA"), Pub. L. No. 116-260 (2020), enacted in December 2020 (collectively education stabilization ("ES") funding).[1]

31.    In addition to directing funds toward amelioration of the immediate effects of the COVID-19 emergency, these appropriations laws sought to address challenges facing American society in the wake of COVID-19, including gaps in the country's education systems following a loss of in-person instructional time.

32.    To that end, these appropriations laws established, and appropriated monies for, three education-related funds: (i) the Elementary and Secondary School Emergency Relief ("ESSER") program initially created in the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) of 2020; (ii) the Homeless Children and Youth ("HCY") program; and (iii) the Emergency Assistance to Nonpublic Schools ("EANS") program.

---

[1] Michigan's, Pennsylvania's, and Maryland's ES funds in dispute here were appropriated under both CRRSA and ARP. For the other Plaintiffs, only ARP funds are at issue.

33.     The critical education investments implemented through ES funding focused on: (i) supporting the safe return to in-person instruction and continuity of services; (ii) addressing the impact of lost instructional time through the implementation of evidence-based interventions, such as summer learning or summer enrichment, extended day, comprehensive afterschool programs, and extended school year programs; (iii) ensuring that such interventions respond to students' academic, social, and emotional needs; (iv) addressing the disproportionate impact of the coronavirus on economically disadvantaged students, children with disabilities, English learners, racial and ethnic minorities, migrant students, students experiencing homelessness, and children and youth in foster care; (v) providing services and assistance to eligible non-public schools significantly impacted by the pandemic, including those with high percentages of low-income students; and (vi) addressing the urgent needs of homeless children and youth exacerbated by the pandemic, among other specific purposes listed in the law.

34.     Many of these areas of focus are not tied to the duration of the public health emergency, including evidence-based interventions (such as summer learning, extended day programs, and afterschool initiatives) intended to mitigate the long-term effects of learning disruptions caused by the pandemic; addressing academic, social, emotional, and mental health needs, especially for marginalized groups like low-income students; and providing educational technology to enhance learning environments.

35.     In contrast, where Congress intended to limit the application of programs or appropriations in COVID-19 related laws, it did so expressly within COVID-related statutes. *See, e.g.*, Coronavirus Aid, Relief, and Economic Security Act of § 1109(h) (providing for a separate program to be administered "until the date on which the national emergency . . . expires").

36.     ED utilized these appropriations, as Congress intended, to offer wide-ranging grants to state education departments through the CRRSA and ARP programs, many of which are the subject of this action.

37.     The grants awarded by ED under ARP to Plaintiffs for the ESSER, HCY, and EANS programs were available to states for obligations incurred through September 30, 2024. ARP § 2001(a). The ARP statute covered obligations incurred through September 30, 2023, but this deadline was automatically extended one year under Section 421 of the General Education Provisions Act (GEPA) (generally referred to as the "Tydings Period"), providing recipients and subrecipients until September 30, 2024, to obligate all funds. GEPA § 421; ESSER Guidance, E-3 (2022) ("An SEA or LEA has until September 30, 2024, to obligate the ARP ESSER funds it receives. This includes the 12-month Tydings Amendment period. Although funds must be obligated by September 30, 2024, grant activities carried out through a valid obligation of funds may continue beyond that date."). Accordingly, funds under the ESSER, HCY and EANS programs were available for obligations incurred by states and their subrecipients through September 30, 2024, with grant activities and liquidation continuing beyond that date.

38.     The grants awarded by ED under CRRSA followed a different schedule. The CRRSA statute covered obligations incurred through September 30, 2022, but as with the ARP programs, this was automatically extended one year under Section 421 of GEPA, providing recipients and subrecipients until September 30, 2023, to obligate all funds. GEPA § 421. Accordingly, funds under CRRSA were available for obligations incurred by states and their subrecipients through September 30, 2023, with grant activities and liquidation continuing beyond that date.

39.     The ES funding awarded to Plaintiffs falls into two broad categories: programmatic funds, which flow through Plaintiffs to local school districts and nonpublic schools to be used to pay for the various projects, facility upgrades, and support services for which Congress specified the funds were to be used; and administrative funds, which flow to each Plaintiff's education agency to be used to cover the cost of managing and distributing the programmatic funds, *i.e.*, to cover overhead, including the salaries of dedicated support staff, and other expenses necessary to administer the ES funding programs.

40.     Under the applicable regulations, Plaintiffs had 120 days from September 30, 2024, to draw upon their ARP awards and 120 days from September 30, 2023, to draw upon their CRRSA awards (the "liquidation period"). *See* 2 CFR § 200.344(c) ("The recipient must liquidate all financial obligations incurred under the Federal award no later than 120 calendar days after the conclusion of the period of performance.").

41.     However, Plaintiffs were invited by ED to request extensions of the liquidation periods for their ES funding as authorized by regulation and consistent with longstanding ED precedent and policy. *See* 2 CFR § 200.344(c) ("When justified, the Federal Agency . . . may approve extensions for the recipient or subrecipient."); *see also* ED Late Liquidation Policy Memorandum (2007) (citing *Appeal of the State of California*, 53 Ed. Law Rep. 1390 (ED.O.H.A.), 1987 WL 124128 (Decision of the Secretary of Education, May 6, 1986) (hereafter, "California Tydings Decision") (outlining the principles for approving late liquidations of ED awards).

42.     ED has long held that federal awards are timely spent so long as they are fully *obligated* within the Tydings Period. *See* California Tydings Decision:

The Secretary finds the legally relevant question to be when the obligation arose, not in what account such obligation may have been initially recorded. An obligation

may be debited to a specific source of funds after the close of the Tydings period so long as there is clear and unambiguous documentation showing that the transaction giving rise to the obligation occurred before the relevant Tydings cutoff date.

43.    ED's invitation came following a report by the Senate Committee on Appropriations encouraging ED to exercise its authority to "extend the period for liquidating financial obligations incurred under grants awarded by" ED, to "announce its policy and process as soon and transparently as possible," and "ensure that its process . . . minimizes the administrative burden [on recipients] to the extent practicable, including by not requiring excessive documentation." Senate Report 118-84, Committee on Appropriations, at pg. 253, available at https://perma.cc/BGA9-XFBP.

44.    As detailed below, each of the Plaintiffs requested extensions of the applicable liquidation periods for their ES funding, and did so *after* the federal government declared in May 2023 that the COVID-19 pandemic was over.[2] Plaintiffs were only allowed to apply for an extension for expenditures that were properly obligated under federal rules, with a binding written commitment to spend the funds. *See* 34 C.F.R. § 75.701. For each extension request, ED determined that the requesting Plaintiff had provided sufficient justification and documentation for an extension and granted the request. For ARP awards, ED in each instance granted the requesting Plaintiffs extensions of their liquidation periods through March 2026. For CRRS awards, ED in each instance granted the requesting Plaintiffs extensions of their liquidation periods through March 2025.

---

[2] *See* https://perma.cc/LVT5-JLJU ("May 11, 2023, marks the end of the federal COVID-19 PHE declaration.").

45.    Based on ED granting these extensions, Plaintiffs and their local school districts understood that they could draw down on their ARP ES funding through March 2026, and on their CRRSA ES funding through March 2025, and relied on this understanding in their dealings with counterparties and local school districts, as discussed in the sections that follow.

46.    The chart below lists for each Plaintiff the relevant ES funding obtained, when extensions of the liquidation periods were requested and granted, and the amount remaining for each ES funding award as of the date of the Rescission Letter.[3]

| Plaintiff | Total ES Funding Awarded | Total Unliquidated ES Funding Remaining as of 3/28/2025 |
|---|---|---|
| California | $15,359,765,795 | ~$205,000,000 |
| New York | $9,306,650,958 | $134,219,838 |
| Pennsylvania | $7,410,963,474 | $207,107,649.53 |
| Michigan | $5,576,954,091 | $25,137,629 |
| Illinois | $5,091,730,996 | $77,248,504 |
| Maryland | $2,896,437,632 | $245,876,498 |
| New Jersey | $2,764,587,703 | $84,642,982.10 |
| Arizona | $2,655,310,459 | TBD |
| Massachusetts | $1,856,223,376 | $105,961,603 |
| Minnesota | ~$1,400,000,000 | $914,868 |
| Oregon | $1,157,517,612 | $4,368,432.45 |
| New Mexico | $1,003,604,375 | $17,868,000 |
| Maine | $411,429,361 | $10,927,286 |

---

[3] The amounts for Nevada were not available as of the filing of this complaint, and so Nevada is not included on the chart.

| Plaintiff | Total ES Funding Awarded | Total Unliquidated ES Funding Remaining as of 3/28/2025 |
|---|---|---|
| Delaware | $410,861,389 | $12,178,115 |
| DC | $393,000,000 | $33,810,796.21 |
| Hawai'i | $2,701,880 | $327,672 |

**B.    Plaintiffs Received Billions of Dollars in ES Funding Grants Under the ESSER, HCY, and EANS Programs and Have Relied on Funds to Provide Critical Services to Their K through 12 Students**

*New York*

47.    New York was awarded a total of $252,458,198 under EANS. New York's EANS funds that it has yet to liquidate are earmarked to fund repairs and improvements to school ventilation systems, as well as educational programs (tutoring, professional development, and mental health counseling) designed to address the learning loss resulting from the COVID-19 pandemic.

48.    New York was awarded a total of $8,995,282,324 under ESSER. The ESSER funds that New York has yet to liquidate are earmarked to fund critical programs and infrastructure improvements for New York schools, including construction of additional classroom space; ventilation installation, upgrades, and repairs; purchase of wheelchair accessible buses; purchase of standardized testing preparation materials; playground installation and repair; purchase of library books; and purchase/repair of classroom projectors. All of these expenditures were timely and properly committed per federal rules through binding written agreements.

49.    New York was awarded a total of $58,910,436 under HCY. New York's HCY funds it has yet to liquidate are earmarked for critical education and care programs for New York's

homeless youth, including food; personal care items; classroom supplies; field trip funding; and specialized training for teachers who work with homeless youth.

### Arizona

50.    The ES funding for a school district in Arizona's Navajo Reservation yet to be liquidated is earmarked for tutoring services to supplement students' reading and math instruction, and to fund critical infrastructure repairs.

### California

51.    On November 4, 2021, ED awarded California a total of $181,312,003.00 under EANS.  ED communicated this award to California via a Grant Award Notification.  As with the EANS funds awarded to New York and other Plaintiff States, California's EANS funds are earmarked to fund, among other things, repairs and improvements to school ventilation systems, as well as educational programs designed to address learning loss resulting from the COVID-19 pandemic.

52.    On November 29, 2021, ED awarded California a total of $15,079,696,097.00 under ESSER.  ED communicated this award to California via a Grant Award Notification.  Similar to ESSER funds awarded to New York and other Plaintiff States, California relies on ESSER funds to address the impact of the COVID-19 pandemic on elementary and secondary schools of its public education system, such as by providing for the purchase of educational technology and adaptive equipment that aids in educational interactions between students and their classroom teachers, including low-income students and children with disabilities.  Pursuant to 2 C.F.R. § 200.305 and other governing provisions, California typically distributes its ESSER funds to LEAs via advancements.

53.    In 2021, ED awarded California with a total of $98,757,695.00 under HCY.  ED communicated this award to California via two separate Grant Award Notifications. California

relies on its HCY funding to, among other things, provide an array of services to children and youth experiencing homelessness, such as instructional support, tutoring and mentoring services, and increased access to school and hygiene supplies. Similar to its ESSER funds, California typically distributes its HCY funds to LEAs via advancements in accordance with 2 C.F.R. §200.305 and other governing regulations.

### *Delaware*

54.    Delaware was awarded a total of $410,861,389 under ESSER. intended to utilize the liquidation extension of ESSER funds to continue services in the 2024-25 school year to contribute to the acceleration of academic support for students. These services included instructional coherence, professional coaching and high-quality reading and mathematics supports; translation services to directly connect school staff with multilingual learners and families; therapeutic support for students along with trauma-informed professional learning opportunities for educators, out of school time providers and community-based organizational partners. This training assists staff with addressing student mental health concerns that impact learning that were exacerbated by the COVID-19 pandemic.  Delaware's public schools planned to use the liquidation extension to continue instructional services in the 2024-25 school year and to complete improvements to school infrastructure. The instructional services provide tutoring for students, including intensive tutoring directed at students with the greatest need. The school infrastructure projects improve air quality and environmental safety to keep classroom learning conditions at the highest quality.

55.    Delaware was awarded a total of $2,691,098 under HCY for education and care programs for homeless youth.

### District of Columbia

56.     The District of Columbia was awarded approximately $386 million in funds under ESSER, $2.5 million under HCY, and $4.5 million under EANS. The District's funds that it has yet to liquidate from these programs are earmarked to fund high-impact tutoring supporting more than 1,900 in more than 40 schools, reading intervention staff, high-quality instructional materials in core subjects, career and technical educational programming focusing on business entrepreneurship, and other programs supporting afterschool tutoring, classroom operations and assessments, and substitute teachers.

### Hawaiʻi

57.     Hawaiʻi was awarded a total of $2,701,880 under HCY. Hawaii's HCY funds it has yet to liquidate would have been used to address challenges felt by students in unstable housing, including programs to expand those students' access to early learning, provide them with additional school transportation options, help them meet graduation requirements, support their transition to college, and connect them and their families with housing, employment, and health resources.

### Illinois

58.     Illinois was awarded a total of $5,058,601,934.00 under ARP ESSER. Illinois's ARP ESSER funds that it has yet to liquidate are earmarked to fund expenses that promote student learning that was lost during the COVID-19 pandemic; including everything from the physical maintenance and improvement of school infrastructure to the acceleration of academic success for students. For example, these funds are earmarked for teacher mentoring, statewide instructional coaching, new principal mentoring, trauma response initiatives, the creation of social emotional learning hubs, and contracts for technology infrastructure upgrades, among other necessary programs.

59.     Illinois was awarded a total of $33,129,062.00 under ARP HCY. Illinois's ARP HCY funds it has yet to liquidate are earmarked for trauma informed instructional training, and the transportation of students experiencing homelessness.

### Maine

60.     Maine was awarded a total of $411,429,361.00 under ESSER.  Maine's ESSER funds that it has yet to liquidate ($10,927,286.32) are earmarked for statewide projects that provide educators with training and support using research-based methodologies to address post-COVID student learning loss and accelerating learning, and local projects to improve ventilation systems in school buildings.

### Maryland

61.     Maryland was awarded a total of $75,127,302 under EANS. Maryland's EANS funds that it has yet to liquidate were spent by the State to purchase educational items and services on behalf of nonpublic schools (for CRRSA) or earmarked for tutoring support and other resources (for ARP).

62.     Maryland was awarded a total of $2,821,310,330 under ESSER. Maryland's ESSER funds that it has yet to liquidate are earmarked for local projects such as support for the science of reading, high-quality school day tutoring, and staff support and retention (for CRRSA), as well as tech devices, curricular materials, classroom furniture, HVAC repairs, student mental health services, tutoring, and after school programming (for ARP). For example, Baltimore City Public Schools—one of Maryland's 24 local education agencies—has relied on the extended liquidation period for ARP-ESSER funds to continue afterschool academic programs for more than 3,000 students and to fund critical school infrastructure projects targeted to improve health and safety in school buildings, such as health suite renovations, bathroom updates, and HVAC repairs and maintenance.

63.    Maryland was awarded a total of $12,787,274 under HCY. Maryland's HCY funds that it has yet to liquidate are earmarked for projects to support academic summer enrichment, student counseling, wraparound services for students, and direct college access and transition services.

### Massachusetts

64.    Massachusetts was awarded a total of $24,826,386 under EANS. Massachusetts' EANS funds that it has yet to liquidate are earmarked to support efforts in schools to address learning loss resulting from the COVID-19 pandemic, among other matters.

65.    Massachusetts was awarded a total of $1,831,396,990 under ESSER. Massachusetts' ESSER funds that it has yet to liquidate are earmarked to fund multiple infrastructure improvements for Massachusetts schools, including HVAC installation, among other matters.

### Michigan

66.    Michigan was awarded a total of $5,378,786,544 under ESSER through CRRSA and ARP.  Michigan's ESSER funds that it has yet to liquidate are earmarked to fund critical programs and infrastructure improvements for Michigan schools that are already in process, including construction of additional classroom space; heating, ventilation, and air conditioning installation, upgrades, and repairs; purchase of curriculum and instructional materials; purchase of library books and equipment; and purchase/repair of educational technology.

67.    Michigan was awarded a total of $24,378,753 under HCY through the ARP. Michigan's HCY funds it has yet to liquidate are earmarked for critical education and care programs for Michigan's children and youth experiencing homelessness, including wraparound support services that include home visits, cross-agency service coordination, and needed school and personal items to positively affect student attendance and full participation in school,

coordinated transportation costs in a rural area of Michigan to support attendance, outreach activities to support identification for programming, and professional learning for educators to support trauma-informed school practices.

68.     Michigan was awarded a total of $173,788,794 under EANS through CRRSA and ARP.

### Minnesota

69.     Minnesota was awarded approximately $1.4 billion in funds through the American Rescue Plan Act.  Of those funds, the Minnesota Department of Education (MDE)'s expenses accounted for approximately $19,376,746.32.

70.     Per the terms of the application extension, these funds were earmarked for contracts with external software vendors that (1) support MDE's implementation of the American Rescue Plan Act through grant administration and data analysis, and (2) modernizes the State's data collection with school districts and student information systems.

### Nevada

71.     Upon information and belief, in January 2021, Nevada was awarded $477,322,438 in ESSER II funds under the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act. No application was required for these funds.  The funds could be used for pre-award costs dating back to March 13, 2020, and available for obligation by State educational agencies and subrecipients through September 30, 2022.[4]

72.     Upon information and belief, Nevada was awarded $1,071,998,392 in ARP ESSER in funds under the American Rescue Plan (ARP) Act.  The funds could be used for pre-award costs

---

[4] There was a discrepancy in the data with one source identifying the year as 2022 and another source identifying it as 2023.  At the time of filing, the discrepancy had not been clarified.

dating back to March 13, 2020, and available for obligation by State educational agencies and subrecipients through September 30, 2023.

73.    Upon information and belief, in January 2021, Nevada was awarded $31,385,542 in GREER funds under the CRRSA Act to help mitigate the impact of COVID-19 on all students and families, including those who choose private schools.

74.    From the award in the preceding paragraph, the amount of $19,375,550 was reserved for Emergency Assistance to Non-Public Schools (EANS).  The balance of $12,009,992 was the GEER II award.  The funds could be used for pre-award costs dating back to March 13, 2020, and available for obligation by Governors and subrecipients through September 30, 2023.

### New Jersey

75.    New Jersey was awarded $2,764,587,703 under the ARP ESSER program, 90% of which was allocated to local school districts. Twenty-one local school districts in New Jersey received late liquidation approval for approximately $85,514,318.15 of ARP ESSER funds. These funds are earmarked for critical infrastructure projects for school buildings, including fire alarm and security system upgrades and other electrical repairs.

76.    New Jersey's State Department of Education was approved, as part of its Tydings Waiver, to extend the period of availability for $2,744,450.15 of its total ARP ESSER III reserve of $10,455,804.00, and for $470,632.91 of its total ARP HCY reserve of $2,526,592. These funds are consolidated under section 8201 of the Elementary and Secondary Educational Act of 1965 (ESEA) and therefore available for any allowable use pursuant to the ESEA. NJDOE has budgeted these funds for staff salaries, a homeless case management system, supports for students who were disproportionately impacted by the pandemic, and improved student level data collection systems.

### New Mexico

77.     New Mexico was awarded a total of $ 17,425,938 under EANS, and as of March 28, 2025, the unliquidated amount remaining was approximately $4.79 million.

78.     New Mexico was awarded a total of $979,761,933 under ESSER, and as of March 28, 2025, the unliquidated amount remaining was approximately $12.3 million.

79.     New Mexico was awarded a total of $6,416,504 under HYC, and as of March 28, 2025, the unliquidated amount remaining was approximately $778,000.

### Oregon

80.     Oregon was awarded a total of $1,121,814,984 under ESSER. Oregon's ESSER funds that it has yet to liquidate are dedicated to the creation of comprehensive teaching frameworks intended to address statewide COVID-related declines in literacy and mathematics. The ESSER funds are also intended to fund communications, regional summits, and educator professional learning networks that are necessary to support the dissemination and implementation of the frameworks throughout the state. In addition, administrative funds were dedicated to finalizing the administration and reporting of pandemic fund activities.

81.     Oregon was awarded a total of $7,346,860 under HCY. Oregon's EANS funds that it has yet to liquidate were part of consolidated federal administrative funds supporting technical assistance and training to districts providing services to students, including those experiencing housing instability.

82.     Oregon was awarded a total of $28,355,768 under EANS. Oregon's EANS funds that it has yet to liquidate were used to finalize payments to vendors providing services and supplies to nonpublic schools and to support Oregon's system of assessment resources, including formative resources and interim tests, and related reporting processes, in order to understand student achievement levels.

*Pennsylvania*

83.    Pennsylvania was awarded a total of $152,741,404 under EANS. Pennsylvania's EANS funds that it has yet to liquidate are earmarked to fund to address learning gaps and provide mental health counseling programs, and to provide repairs and improvements to school ventilation systems—repairs and improvements which may take many years to complete.

84.    Pennsylvania was awarded $7,225,473,414 under ESSER. Pennsylvania's ESSER funds that it has yet to liquidate are earmarked to fund critical programs and infrastructure improvements for Pennsylvania schools, including HVAC investments, audio improvements, and school construction projects to enhance student health and safety.

85.    Pennsylvania was awarded a total of $32,748,656 under HYC. Pennsylvania's HCY funds it has yet to liquidate are earmarked for critical education and care programs for Pennsylvania's homeless youth.

**C.    ED Granted Plaintiffs Extensions of the Liquidation Periods**

86.    ED supplied Plaintiffs with a form to fill out when seeking an extension of time to liquidated ES funding, in which the Plaintiffs were required to provide detailed information about the unliquidated grant amounts, what subrecipients (*i.e.*, particular schools or contractors) they would fund, ways in which the funds would be spent, and the substantive reason(s) why each subrecipient required an extension. Such justifications were required to contain information explaining the circumstances preventing grantees and their subgrantees from liquidating expenditures within the existing liquidation period.

*New York*

87.    On August 19, 2024—15 months *after* the federal government declared the COVID-19 pandemic to be over—New York submitted a request for additional time to liquidate $203,217,132 in EANS funds.

88.    On September 24, 2024, ED approved New York's request and extended the applicable liquidation period for the remaining EANS funds through March 28, 2026, finding "[a]fter careful review, . . . that New York's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

89.    On December 5, 2024, New York submitted a request for additional time to liquidate $1,741,854 in HCY funds and $158,239,995 in ESSER funds.

90.    On January 7, 2025, ED approved New York's HCY extension request and extended the applicable liquidation period for the remaining HCY funds through March 28, 2026, finding, "[a]fter careful review, . . . that New York's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

91.    On January 13, 2025, ED approved New York's ESSER extension request and extended the applicable liquidation period for the remaining ESSER funds through March 28, 2026, finding, "[a]fter careful review, . . . that New York's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

92.    As of March 28, 2025, New York had a total of $134,219,838 in unliquidated ES funding.

### Arizona

93.    ED granted Arizona an extension of the time to liquidate its ESSER funds through February 28, 2026, for its local education agencies and March 28, 2026, for its state education agency.

### California

94.    On January 9, 2024, ED invited the California Department of Education (CDE) to apply for a liquidation extension of its EANS funds.  On April 4, 2024, CDE submitted a request to ED for an extension for late liquidation of EANS funds in the amount of $99,720,924.66.  On

June 3, 2024, ED approved CDE's request. With this decision, California's liquidation period for EANS was extended through December 31, 2025.

95.    As with its invitation for CDE to apply for a liquidation extension of its EANS funds, on January 9, 2024, ED invited CDE to apply for a liquidation extension of its ESSER funds.  On December 9, 2024, CDE requested a liquidation extension for ESSER obligations totaling $152,450,001.72.  On January 14, 2025, ED approved CDE's request for late liquidation. On February 11, 2025, CDE amended its liquidation extension request to have it apply to an additional $29,949,690.41.  Accordingly, the total amount underlying the ESSER late liquidation request increased to $182,399,692.13.   On February 12, 2025, ED approved CDE's amended liquidation extension request, and indicated that California would retain access to these ESSER funds until March 28, 2026.

96.    On February 23, 2024, ED invited CDE to apply for a liquidation extension of its HCY funds.  On December 23, 2024, CDE requested an extension to the liquidation period for HCY funds totaling $506,002.15.  On January 17, 2025, ED approved this liquidation extension request and extended California's liquidation period for HCY funds to March 28, 2026.

97.    As of March 28, 2025, California has a total of $23,059,020.04 in unliquidated EANS funds. Because California LEAs receive advancements from CDE under the ESSER and HCY programs, LEAs across the state have already obligated funds for numerous projects contemplated under those programs.  Accordingly, California's unliquidated and liquidated ESSER and HCY funds for which ED had approved liquidation extensions are imperiled by the rescission from March 28, 2025.  As noted above, California's approved liquidation extension amount for ESSER is $182,399,692.13, and the approved liquidation extension amount under HCY is $506,002.15.

### *Delaware*

98.    On July 23, 2024, Delaware submitted a request for additional time to liquidate $42,604.241.92 in ESSER funds. Delaware intentionally made the extension request prior to the September 30, 2024, obligation deadline in order to allow local educational agencies sufficient time to plan educationally supported projects before committing to contractual obligations. Delaware included an attestation with its request which among other things attested that the activities and services included within the liquidation extension were allowable and properly obligated by September 30, 2024, according to the American Rescue Plan Elementary and Secondary School Emergency Relief Fund.

99.    On August 13, 2024, ED approved Delaware's ESSER extension request and extended the applicable liquidation period for the remaining ESSER funds through March 28, 2026, finding, "[a]fter careful review, . . . that Delaware's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

100.    On September 27, 2024, Delaware submitted a request for additional time to liquidate $655,928.23 in HCY funds. Delaware included an attestation with its request which among other things attested that the activities and services included within the liquidation extension are allowable and have been properly obligated by September 30, 2024, according to the American Rescue Plan Elementary and Secondary School Emergency Relief – Homeless Children and Youth.  On October 21, 2024, ED approved Delaware's HCY extension request and extended the applicable liquidation period for the remaining HCY funds through March 28, 2026, finding, "[a]fter careful review, . . . that Delaware's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

101.    As of March 28, 2025, Delaware had a total of $12,178,114.63 in unliquidated Education Stabilization funding.

### District of Columbia

102.    On January 10, 2025—20 months *after* the federal government declared the COVID-19 pandemic to be over—the District of Columbia submitted a request for additional time to liquidate EANS funds, which ED approved on January 21, 2025.

103.    On December 19, 2024, the District of Columbia submitted a request for additional time to liquidate $22,764.28 in HCY funds and $25,696,312.27 in ESSER funds. ED granted the District's ESSER extension request on January 13, 2025, and it granted the District's HCY request on January 7, 2025. *Id.* These approvals extended the applicable liquidation period for the remaining EANS, ESSER, and HCY funds to March 28, 2026.

104.    As of March 28, 2025, the District of Columbia had a total of $33,810,796.21 in unliquidated ES funding.

### Hawai'i

105.    On December 12, 2024, Hawai'i submitted a request for additional time to liquidate $752,223 in HCY funds.

106.    On January 7, 2025, ED approved Hawaii's request and extended the applicable liquidation period for the remaining HCY funds to March 28, 2026, finding, "[a]fter careful review, . . . that Hawaii's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

107.    As of March 28, 2025, Hawai'i had $327,671.62 in unliquidated HCY funding.

### Illinois

108.    On January 27, 2025, nineteen months *after* the federal government declared the COVID-19 pandemic to be over—Illinois submitted a request for additional time to liquidate $85,502.86 in ARP HCY funds.

109.    On March 17, 2025, ED approved Illinois's request and extended the applicable liquidation period for the remaining ARP HCY funds through March 28, 2026, finding "Illinois's request provides sufficient justification and documentation for an extension to the period of liquidation for ARP-HCY funds" in accordance with 2 C.F.R. § 200.344.

110.    On January 10, 2025, nineteen months *after* the federal government declared the COVID-19 pandemic to be over—Illinois submitted a request for additional time to liquidate $97,738,340.35 in ARP ESSER funds.

111.    On January 22, 2025, ED approved Illinois's request and extended the applicable liquidation period for the remaining ARP ESSER funds through March 28, 2026, finding "Illinois's request provides sufficient justification and documentation to the period of liquidation for ARP ESSER funds" in accordance with 2 C.F.R. § 200.344.

112.    As of March 28, 2025, Illinois has a total of $77,248,503.85 in unliquidated ES funding.

### Maine

113.    On January 9, 2024, ED invited the Maine DOE to apply for a liquidation extension of its ESSER funds.  On December 19, 2024, the Maine DOE submitted a liquidation extension request which included detailed grantee and subgrantee information requested by the ED template.

114.    On January 13, 2025, through a grantee letter Maine's ARP ESSER liquidation extension request was approved through March 28, 2026.  The grantee letter states that the USDE has "determined that Maine's request provides sufficient justification and documentation for an extension to the period of liquidation for ARP ESSER funds and approve the extension through March 28, 2026."

115.    The request and the grantee letter clearly articulated the "need for additional time to liquidate $17,144,640.72 of ARP ESSER funds after the period of liquidation under 2 CFR § 200.344(b) expires" for ongoing student support and delayed air quality projects.

### Maryland

116.    On December 11, 2024, Maryland submitted a request for additional time to liquidate $312,277 in ARP-EANS funds.

117.    On January 22, 2025, ED approved Maryland's request and extended the applicable liquidation period for the remaining ARP-EANS funds through March 28, 2026, finding "[a]fter careful review, . . . that Maryland's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

118.    On December 18, 2024, Maryland submitted a request for additional time to liquidate $1,741,854 in ARP-HCY funds.

119.    On January 7, 2025, ED approved Maryland's ARP-HCY extension request and extended the applicable liquidation period for the remaining ARP-HCY funds through March 28, 2026, finding, "[a]fter careful review, . . . that Maryland's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

120.    On January 14, 2025, Maryland submitted a request for additional time to liquidate $160,505,073.59 in ARP-ESSER funds.

121.    On January 22, 2025, ED approved Maryland's ARP-ESSER extension request and extended the applicable liquidation period for the remaining ARP-ESSER funds through March 28, 2026, finding, "[a]fter careful review, . . . that Maryland's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

122.    On January 26, 2025, Maryland submitted a request for additional time to liquidate $79,919,204.78 in CRRSA-ESSER funds and $3,325,422.73 in CRRSA-EANS funds.

123.    On February 6, 2025, after the change in administration, Massachusetts submitted to ED updated financial information for its EANS and ESSER awards. In two emails, both dated February 12, 2025, ED employee Khloe Graczyk acknowledged the amendments and stated that "[a]s a reminder, continued access to" the remaining EANS and ESSER funds "will be approved through March 28, 2026."

124.    On March 17, 2025, ED approved Maryland's CRRSA-ESSER and CRRSA-EANS extension requests and extended the applicable liquidation period for the remaining funds through March 31, 2025, finding, "[a]fter careful review, . . . that Maryland's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

125.    As of March 28, 2025, Maryland had upwards of $245,876,498.23 in unliquidated ES funding.

### *Massachusetts*

126.    On October 8, 2024, Massachusetts submitted a request for additional time to liquidate $2,333,904.24 in EANS funds.

127.    In a letter dated November 20, 2024, Adam Schott, Principal Deputy Assistant Secretary for ED stated: "After careful review, I have determined that Massachusetts' request provides sufficient justification and documentation for an extension to the period of liquidation for ARP EANS funds and approve the extension through March 28, 2026."

128.    On October 8, 2024, Massachusetts submitted a request for additional time to liquidate $182,252,073.11 in ESSER funds.

129.    In a letter dated October 24, 2024, Adam Schott, Principal Deputy Assistant Secretary for ED stated: "After careful review, I have determined that Massachusetts' request

provides sufficient justification and documentation for an extension to the period of liquidation for ARP ESSER funds and approve the extension through March 28, 2026."

130.    As of March 28, 2025, Massachusetts had a total of $105,961,602.79 in unliquidated ES funding.

### *Michigan*

131.    Michigan received an extension to liquidate ESSER II funds appropriated under the CRRSA totaling $3,628,022.57.  On June 20, 2024, Michigan submitted a request for additional time to liquidate the $3,628,022.57 in ESSER II funds for administrative expenditures.  On July 5, 2024, ED approved Michigan's request and extended the liquidation period for these funds through March 31, 2025.

132.    Michigan received an extension to liquidate ESSER III funds appropriated under the ARP totaling $44,283,405.21. On December 27, 2024, Michigan submitted a request for additional time to liquidate the $44,283,405.21 ($4,213,646 for administrative, $40,069,759.21 for grants) in ESSER III funds.  On January 14, 2025, ED approved Michigan's request and extended the liquidation period for these funds through March 28, 2026.

133.    Michigan also received an extension to liquidate ARP-HCY funds. On September 27, 2024, Michigan submitted a request for additional time to liquidate $326,677.76 in ARP-HCY funds ($138,658 in administrative funds and $188,019.76 in grant funds).  On January 7, 2025, ED approved Michigan's request and extended the liquidation period for these funds through March 28, 2026.

134.    In addition, Michigan received an extension to liquidate EANS funds appropriated under the ARP.  On September 27, 2024, Michigan submitted a request for additional time to liquidate approximately $50,000 in ARP EANS (administrative) funds.  On October 25, 2024, ED

approved Michigan's request and extended the liquidation period for these funds through March 31, 2026.

135.    As of April 8, 2025, Michigan had a total of 25,137,628.93 in unliquidated ES funding.

### Minnesota

136.    On December 20, 2024, MDE requested an extension for contracts it was unable to liquidate before the October 2024 deadline in the amount of $2,189,622. MDE received the requested extension. As of the date of this filing, MDE has not yet received $914,868 of the requested extension funding.

### Nevada

137.    Upon information and belief, in December 2024, Nevada requested late liquidation and was approved in January 2025.  Nevada intends to request the case-by-case project liquidation extension.

### New Jersey

138.    On December 20, 2024, New Jersey submitted a liquidation extension request for an extension of time for 21 of its local school districts to liquidate ARP ESSER funds, which was later amended on December 23, 2024, and January 3, 2025.

139.    On January 14, 2025, the Department granted NJDOE's request to extend the time to liquidate $82,769,868.00 of ARP ESSER funds through March 28, 2026, finding "[a]fter careful review, . . . that New Jersey's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

140.    As of March 28, 2025, New Jersey had a total of $84,642,982.10 in unliquidated ES funding.

### New Mexico

141.    On January 13, 2025—19 months *after* the federal government declared the COVID-19 pandemic to be over—New Mexico submitted a request for additional time to liquidate its remaining EANS funds.

142.    On January 21, 2025, ED approved New Mexico's request and extended the applicable liquidation period for the remaining EANS funds through March 28, 2026, finding "[a]fter careful review, . . . that New Mexico's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

143.    On November 6, 2024, New Mexico submitted a request for additional time to liquidate its remaining HCY funds.

144.    On December 10, 2024, ED approved New Mexico's HCY extension request and extended the applicable liquidation period through March 28, 2026, finding, "[a]fter careful review, . . . that New Mexico's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

145.    On October 29, 2024, New Mexico submitted a request for additional time to liquidate its remaining ESSER funds.

146.    On November 25, 2024, ED approved New Mexico's ESSER extension request and extended the applicable liquidation period for the remaining ESSER funds through March 28, 2026, finding, "[a]fter careful review, . . . that New Mexico's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

147.    As of March 28, 2025, New Mexico had a total of approximately $17.8 million in unliquidated ES funding.

### *Oregon*

148.    On October 16, 2024, Oregon requested an extension of the liquidation period for $3,925,000 of the ESSER funds. On December 23, 2024, ED granted the extension, finding that the request "provide[d] sufficient justification and documentation for an extension" and extended the liquidation period through March 28, 2026. On March 28, 2025, before 5:00 p.m., Oregon submitted a reimbursement request for $145,000 to ED and has received no response.

149.    Separately, on July 22, 2024, Oregon requested a waiver to consolidate and extend the period of availability for administrative expenses to be claimed for both the ESSER and HCY programs under the Elementary and Secondary Education Act of 1965 ("ESEA") and the General Education Provisions Act along with an eligible Title fund program. On August 26, 2024, ED approved Oregon's extension request, finding that "the request meets the requirements in ESEA section 8401." The availability period was extended through March 31, 2026.

150.    Additionally, on October 10, 2024, Oregon notified ED that it would need a Late Liquidation extension for its EANS funds. On December 26, 2024, ED provided Oregon with instructions for submitting an EANS Late Liquidation request, to include a cover letter and completed form. On January 16, 2025, ED instructed Oregon to submit its request only after Oregon had "full data" and were ready to draw down all remaining EANS funds. ED also confirmed that this submission should occur after the liquidation period expired on January 28, 2025. On March 28, 2025, at 5:02 p.m., Oregon submitted a request for reimbursement as instructed by ED, seeking reimbursement for $331,388.67. Oregon has not received a response from ED.

### *Pennsylvania*

151.    On February 10, 2025, and through subsequent email communications, PDE submitted requests to continue liquidating EANS funds.

152.    ED has not responded to PDE's repeated requests to permit extended liquidation of EANS grant funds.

153.    On December 19, 2024, 19 months after the federal government declared the COVID-19 pandemic to be over, Pennsylvania submitted a request for additional time to liquidate $12,190,576.89 in HCY funds.

154.    On January 8, 2025, 20 months after the official end of the COVID-19 pandemic, ED approved Pennsylvania's HCY extension request and extended the applicable liquidation period for the remaining HCY funds through March 28, 2026, finding, "[a]fter careful review, . . . that Pennsylvania's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344

155.    On January 16, 2025, Pennsylvania submitted a request for additional time to liquidate $39,614,602.67 in ESSER funds.

156.    On January 22, 2025, 20 months after the official end of the COVID-19 pandemic, ED approved Pennsylvania's ESSER extension request and extended the applicable liquidation period for the remaining ESSER funds through March 28, 2026, finding, "[a]fter careful review, . . . that Pennsylvania's request provides sufficient justification and documentation for an extension" in accordance with 2 C.F.R. § 200.344.

157.    As of March 28, 2025, Pennsylvania had a total of $$207,107,649.53 in unliquidated ES funding (including unliquidated CRSSA funding of $21,953,215.85).

**D.    ED Abruptly Rescinds Plaintiffs' Extension Approvals and Imposes an Immediate Termination of All Liquidation Periods**

158.    Prior to March 28, 2025, Plaintiffs (along with their local school districts, nonpublic schools, and contractors) were relying on the extension approvals permitting Plaintiffs to draw upon the ES funding through the expiration of the extended liquidation periods in executing

agreed-upon plans to deliver services to students and engage in building projects aimed at combating the long-term effects of the pandemic.

159.    At 5:03pm ET on March 28, 2025, ED's Office of Communications and Outreach sent a mass email to all "Chief State School Officers" attaching the Rescission Letter from Secretary McMahon. The Rescission Letter, also dated March 28, 2025, notified all recipients, including the state education departments of Plaintiffs, that ED "is modifying the liquidation period to end on March 28, 2025, at 5:00pm ET" based on its conclusion that ED's prior approvals of requests to extend liquidation periods were "not justified."

160.    The Rescission Letter further advised that "[e]xtending deadlines for COVID-related grants . . . years after the COVID pandemic ended is not consistent with [ED's] priorities and thus not a worthwhile exercise of its discretion." The Rescission Letter also advised that ED finds "any reliance interests developed" by ES funding recipients based on prior extension approvals "are minimal" and "unreasonable," stating that because the extension approvals were a matter of agency discretion, ES funding recipients "could not rely on the Department adhering to its original decision." This was the sum of ED's alleged justification for rescinding the liquidation period extensions granted to Plaintiffs.

161.    The Rescission Letter purports to "amend[] the period of liquidation to end on March 28, 2025, at 5:00pm ET"—three minutes *before* the email attaching the Rescission Letter was sent.

**E.    The Rescission Letter Has Caused and Will Continue to Cause Irreparable Harm**

162.    ED's rescission of all prior extension request approvals and declaration without any advance notice that all previously extended liquidation periods are now deemed to have already expired is already having and will continue to have devastating effects on vital state and local

government education programs and services designed to ameliorate the long-term effects of the pandemic.

163.     ED's rescission is causing, and will continue to cause, significant and irreparable harm to Plaintiffs. Plaintiffs and their local school districts, nonpublic schools, and contractors have created budgets, hired staff, offered services to families and children, and developed operating plans in reliance on the already approved extensions of the liquidation period through March 28, 2026. Indeed, Plaintiffs had already spent awarded funds for which they have not yet sought reimbursement from ED when the Rescission Letter issued. The Rescission Letter purports to cutoff the period during which Plaintiffs can obtain reimbursement for these funds as well as ES funding Plaintiffs have committed to pay in the future under obligations incurred through September 30, 2024.

164.     Plaintiffs and their subgrantees relied on the extensions of the liquidation period through March 2026 in budgeting around the programs and services to be paid for by the awarded grants.

165.     The abrupt rescission of the previously approved extensions has caused upheaval for Plaintiffs, including immediate harm to public education initiatives and the termination, and future termination, of state employees and contractors as States and districts absorb the losses of the obligated ES funding with their operational budgets.

### *New York*

166.     New York's primary vendor for implementing the EANS program, who contracts directly with the New York State Education Department (NYSED), has already furloughed staff in response to the Rescission Letter, with plans to lay those staff off if the funds are not made available soon. If that happens, there will not be enough time to hire new staff and get the programs back up

and running for the 2024-2025 academic year. Furthermore, NYSED has 19 employees that it has hired using EANS administrative funds.

167.    Also at risk are numerous educational, social-emotional, and construction projects that were supported by these funds, including construction that was ongoing, with costs being incurred or projects partially completed with the understanding that reimbursement would be available. New York does not have funds in its education budget to make up for the shortfall in funds resulting from the Rescission Letter.

### Arizona

168.    In Arizona, a school district located on the Navajo Reservation was approved to use ESSER III funds for a tutoring service to supplement students' reading and math instruction and to repair aging infrastructure that left students vulnerable during the COVID-19 pandemic.  After ED's rescission letter, the school terminated the tutoring service and the infrastructure project.  Because the school has not been reimbursed for funds already expended, it has used a majority of its limited reserve funds to cover outstanding costs and will likely need to lay off teachers and staff members as a result.

### California

169.    In the short time since its enactment, ED's rescission of ARP liquidation extensions has created a substantial hardship for CDE and its vendors under the ARP programs at issue, to say nothing of the communities and students who benefit from their services.  For example, in accordance with the ED's approval of CDE's liquidation extensions, CDE has obligated EANS funds through contractual agreements with vendors to provide services to non-public schools and has relied on the vendors' invoices as the documentation to support accessing and drawing down the EANS funding.  Due to ED's sudden rescission of liquidation extensions, CDE has lost the

ability to reimburse vendors for EANS costs they have already incurred, thereby materially impeding CDE's contractual obligations to these vendors. To date, of the 10 vendors CDE relies on to provide its services under EANS, 3 have already communicated to CDE they are ceasing all of their EANS-related services to schools and students due to non-payment.

170.    Similarly, since California LEAs receive advancements from CDE under the ESSER and HCY programs, LEAs across the state have already obligated funds for numerous projects contemplated under those programs. For example, many school districts across California have entered into multi-million-dollar contracts for the renovation and improvement of their heating, ventilation, and air conditioning (HVAC) systems, and did so with the understanding that they would be able to cover associated expenses through ESSER funding. Now, in light of ED's rescission of those funding sources, LEAs can no longer fulfill their payment obligations under those contracts, thereby leaving the underlying projects unfinished and compromising the relationship between California LEAs and their contractors.

### Delaware

171.    The Delaware Department of Education does not have the budget to make up for the shortfall if the unliquidated Education Stabilization funding is not disbursed. This critical loss of Education Stabilization funding has caused upheaval for Delaware, including immediate harm to public education initiatives and confusion among grant recipients. If the recission is allowed to stand the State will be forced to quickly find unbudgeted and unplanned funds or cancel contracts which would significantly delay and interrupt efforts to create healthy and safe learning environments. For example, Caesar Rodney School District used grant funds to purchase Smart Boards, a technology necessary to support their students' recovery and academic success after the disruptions caused by COVID-19. The Smart Boards have been delivered but without the

additional funds, Caesar Rodney will not be able to install the Boards, wasting the funds already expended while failing to get the technology that supports teaching and learning.

### District of Columbia

172.    The District of Columbia was relying on ES funding to continue high-impact tutoring, administer professional development for teachers, conduct student assessments, and implement data tools to support ongoing academic recovery for students. *See* Stewart Decl. ¶ 10. The immediate loss of these funds will cause the District to terminate contracts and discontinue services providing: state-administered high-impact tutoring in over 40 schools supporting more than 1,900 students; school-based high-impact tutoring for students in grades 2-5; afterschool tutoring; reading intervention staff; high-quality core subject instructional materials; professional development services for teachers; contracts for substitute teachers; school operations contracts; classroom assessments; and the termination of up to 140 school staff members.

### Illinois

173.    Without the nearly $80 million Illinois has in unliquidated ES funding, Illinois will be forced to end education initiatives aimed to improve quality of instruction and learning outcomes for students across the State. The State Board of Education will be forced to cancel 66 intergovernmental contracts with regional offices of education that provide instructional services and professional learning to school districts. The ES funding is also relied upon to employ 91 instructional coaches who enhance teaching quality and improve student learning outcomes for students across Illinois. These instructional coaches have performed 2,738 visits with districts across Illinois this school year alone. The State may also have to end new teacher and principal mentoring programs—programs which, between now and the end of the fiscal year, will have supported 1,225 new educators, 378 virtual coaches, 172 mentors, and 165 first-year principals

from schools across the State. These programs make teachers and principals more likely to stay in their roles for longer and equip them with the necessary skills to provide students with the math, literacy, and social-emotional learning they missed out on during the COVID-19 pandemic.

### *Maine*

174.    Without the unliquidated ES funding, Maine is cancelling trainings that would have served hundreds of educators.  The state's contractors will have to lay off staff.  More than 100 teachers will not be paid for their work or reimbursed for materials they paid for out-of-pocket. Two school districts will be left footing the bill for partially completed ventilation projects that they have not budgeted local funds for.

### *Maryland*

175.    In Maryland, one of the state's local education agencies, Baltimore City Public Schools, has announced the cancellation of tutoring and afterschool programs supported by ES funds.

176.    Baltimore City Public Schools already has spent the vast majority of ES funds for which it requested liquidation extensions and will need to cut other projects and programs to cover the approximately $48 million budget gap created by ED's rescission.

### *Michigan*

177.    In Michigan, Battle Creek Public Schools is completing an HVAC project at their schools with the $2,491,807.91 in ESSER III funds that had been approved for liquidation over the next year.  If Michigan does not receive these funds that would otherwise be available absent the Rescission Letter for this project, Battle Creek Public Schools would likely need to abandon the HVAC project that is in process.

178.    In addition, Michigan's Department of Education had received extensions for approximately $8 million in administrative funds available under ESSER II, ESSER III, and ARP-HCY.  This funding supported contracts used for reporting and monitoring under the CRRSA and ARP requirements.   If Michigan does not receive the funding that would otherwise be available absent the Rescission Letter, Michigan's Department of Education risks being found in default of these contracts.  In addition, these administrative funds support MDE staff oversight of district use and spending of ESSER funds.

### Minnesota

179.    If the funds are not forthcoming, MDE may have to narrow the scope of the planned work and pay for the remaining contractual obligations with state funds, for MDE has budgeted the funding to other entities in reliance to USDOE approval of the extension.

### Nevada

180.    Upon information and belief, as a result of the ED rescission letter, fourteen temporary employees who were paid under ESSER have been terminated.

181.    Upon information and belief, in response to the ED rescission letter, at least one company disabled its invoicing portal which is affecting the ability of other vendors to submit bills for payment.

### New Jersey

182.    ED's rescission of the approved liquidation extension for ES funds will cause significant irreparable harm for New Jersey and its local school districts.

183.    The school districts that received liquidation extensions have created budgets, entered into contracts, have purchased raw materials, and developed operating funds to improve school environmental standards in line with public health standards. These school districts acted

in reliance on the fact that, so long as they complied with the terms and conditions of the ES funding awards, they would be able to draw upon those funds through March 28, 2026.

184.    As a result of ED's February 19, 2025, guidance, many school districts have made payments on these obligations, intending to seek reimbursement from ED. Some school districts have not yet been able to seek such reimbursement and face uncertainty as to whether they will need to foot the bill for these services that ED had previously pledged to pay.

185.    Separate from the school districts, the New Jersey Department of Education ("NJDOE") has also suffered irreparable harm. For example, NJDOE has given an offer to fill a Literacy Specialist position, who would be paid from ARP HCY funds. The Literacy Specialist was intended to work in the Office of Learning Equity Academic Recovery to assist in designing literacy curricula, training, and program improvement. NJDOE was also using its ES funds to create a homeless case management system, and implement upgrades to its grant system. Without the ES funds, NJDOE is unlikely to be able to complete these necessary projects due to budgetary constraints.

### *New Mexico*

186.    New Mexico's Public Education Department was relying on the availability of this approximately $17.8 million in unliquidated funds to address the negative impact that COVID-19 had on children's education and educational outcomes. Among other things, these funds were to be used to provide educational services to remedy learning loss that resulted from the long-term pause in in-person instruction including intensive tutoring programs in math and literacy and family and student engagement programs. The funds were also to be used to improve school facilities, including ventilation and air conditioning systems.

### Oregon

187.    Without the ES grant funds, among other things, Oregon will have to terminate all work associated with its WestEd contract. As one example of the negative repercussions flowing from that termination, Oregon will have to cancel five scheduled summits that were carefully planned and booked to ensure statewide participation, intended to provide training on the frameworks and instructional resources prepared by WestEd for ultimate dissemination to 750 educators across the state. Oregon will also lose the benefit of investments already made into that and other efforts intended to address widespread learning losses that occurred during the pandemic.

### Pennsylvania

188.    Defendants' abrupt rescission of the previously approved extensions has harmed PDE, Pennsylvania schools, and taxpayers.  Pennsylvanians will ultimately bear the burden of the ED's failure to keep its word, as PDE, its LEAs and Pennsylvania taxpayers have been or will be forced to make payments for goods and services already provided under CARES grant programs based on the ED's assurance that such payments would be reimbursed as enacted by Congress and as promised by ED. Further, in the absence of a remedy here, Pennsylvania schools and students will continue to suffer from the lack of appropriate physical facilities and will not benefit from the programs designed to address learning loss that the CARES Act funded.

189.    All Plaintiffs have suffered, and will continue to suffer, immediate irreparable harms similar to these examples.

190.    That Defendants rescinded the approved liquidation period extension requests without any warning and with immediate effect—indeed, declaring at the time of the rescission that the prior liquidation periods were already deemed to have expired—only exacerbates the harm

to Plaintiffs by depriving them of any opportunity to undertake advance planning to mitigate the devastating impact of ED's reversal of position.

191.    In sum, Defendants' actions to unlawfully and suddenly rescind the extension request approvals and declare all previous liquidation periods to have already expired has resulted in immediate and continuing irreparable harm to Plaintiffs, their public education agencies, local school districts, nonpublic schools, contractors, and their residents. These harms will deepen considerably if Defendants are not enjoined from rescinding the prior extension request approvals through March 2026.

## CAUSES OF ACTION

## COUNT I

## Rescission Letter Violates Administrative Procedure Act – Arbitrary and Capricious

192.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

193.    The Rescission Letter is a final agency action subject to the APA.

194.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

195.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to the difference in view or the produce of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

196.    The APA directs a court to set aside an agency action that is not the product of "reasoned decisionmaking" and is "arbitrary and capricious." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). An agency cannot "depart from a prior policy sub silentio" or simply disregard its prior practice. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515-16 (2009). Rather, when changing positions agencies must "provide a reasoned explanation for the change," "'display awareness that [they are] changing position,' " and consider " 'serious reliance interests.' " *Encino Motorcars, LLC v. Navarro*, 579 U. S. 211, 221–222 (2016) (quoting *Fox Television Stations*, 556 U. S. at 515).

197.    ED's Rescission Letter fails to pass muster under the Supreme Court's "change-in-position doctrine," which applies where an "agency changed existing policy." *Food & Drug Admin. v. Wages and White Lion Investments, L.L.C.*, No. 23-1038, 2025 WL 978101, at *13-*14 (U.S. Apr. 2, 2025). ED has changed existing policy because, by issuing the Rescission Letter, it has acted "inconsistent[ly]" with an "earlier position," *Encino Motorcars*, 579 U.S. at 224, performed "a reversal of [its] former views as to the proper course," *State Farm*, 463 U. S., at 41, and "disavow[ed]" prior "inconsistent" agency action as "no longer good law," *Fox Television*, 556 U. S., at 517 (internal quotation marks omitted). *See also Wages and White Lion Investments*, 2025 WL 978101, at *14.

198.    Despite changing existing policy, Defendants have not provided any "good reasons" for rescinding its prior approval of Plaintiffs' extension requests and setting aside longstanding policy. *Wages and White Lion Investments*, 2025 WL 978101, at *14. The Rescission Letter provides only a single purported justification for ED's sudden change of position: "Extending deadlines for COVID-related grants . . . years after the COVID pandemic ended is not consistent with the Department's priorities and thus not a worthwhile exercise of its discretion."

The government had already declared the COVID-19 emergency over when ED issued approvals of the extension requests; thus, the rationale ED uses to support its abrupt change in policy is nonsensical.

199.    The Rescission Letter points to no other facts supporting ED's reversal of position. It contains no acknowledgment of the public education purposes for which the fully obligated grants actually have been and are being used, much less an explanation of why those uses are no longer necessary. Indeed, substantial evidence before the agency shows that the grants at issue continued to be used for needed purposes such as supporting summer instruction and extended day programs to mitigate the long-term effects on students of lost instruction time, as Congress intended, and as ED recognized in granting the extensions.

200.    There is no indication that Congress intended Defendants to rely on the pandemic being "over" as a reason to rescind prior approval of extension requests.

201.    Upon information and belief, in issuing the Rescission Letter, Defendants conducted no individualized assessment of the justifications previously provided by Plaintiffs in support of their extension requests and accepted by ED as sufficient.

202.    Moreover, Defendants failed to take into consideration the substantial reliance interests of Plaintiffs and their districts and the tremendously harmful impact of immediately rescinding the liquidation period extensions, without any warning—to the contrary, Defendants erroneously characterized Plaintiffs' reliance interests as "minimal" and "unreasonable." Plaintiffs and their districts face the impossible decision of terminating partially completed projects and services, defaulting on payments to contractors, and/or having to absorb costs in operational budgets, affecting funding for teachers and core educational services.

203.    Defendants have provided no other reasoned explanation for their sudden change in position since approving the extensions requests within the past few months.

204.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Rescission Letter violates the APA because it is arbitrary and capricious.

205.    Plaintiffs are also entitled to vacatur of the Rescission Letter and reinstatement of the prior extended liquidation periods pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunctions preventing Defendants from implementing, enforcing, or reinstating the Rescission Letter.

## COUNT II

**Rescission Letter Violates Administrative Procedure Act – Contrary to Law**

206.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

207.    The Rescission Letter is a final agency action subject to the APA.

208.    The Rescission Letter provides only a single purported justification for ED's sudden change of position: "Extending deadlines for COVID-related grants . . . years after the COVID pandemic ended is not consistent with the Department's priorities and thus not a worthwhile exercise of its discretion."

209.    However, states may lawfully request extensions of the liquidation periods for their ES funding pursuant to longstanding ED precedent and federal regulation. *See* California Tydings Decision; 2 CFR § 200.344(c) ("When justified, the Federal Agency . . . may approve extensions for the recipient or subrecipient.").

210.    Congress urged ED to exercise its authority extend the liquidation period for Plaintiffs. Senate Report 118-84, Committee on Appropriations, at pg. 253, available at https://perma.cc/BGA9-XFBP.

211.    To qualify for an extension under established ED decisions and policy, Plaintiffs were required to provide sufficient justification and documentation of the underlying obligation of funds. In granting Plaintiffs' requests for extensions of the liquidation periods for ES funding, ED expressly determined in every instance Plaintiffs had provided sufficient justification and documentation of the underlying obligations.

212.    Defendants did not undertake any individualized consideration of the awards at issue; instead, they simply issued a blanket rescission of all prior approvals of Plaintiffs' extension requests based on the end of the COVID-19 pandemic in 2023 when, as a matter of law, that is not a lawful basis to rescind an already-granted extension of a liquidation period.

213.    The relevant regulations and policy do not authorize rescinding an extension already granted based on the fact that the pandemic has ended. To the contrary, Congress affirmatively chose to continue funding the ES funding grants as recently as June 2023—*after* approval of the resolution formally ending the COVID-19 emergency. This is particularly relevant because, in other contexts, Congress spoke unambiguously about whether funds should continue to be available at the end of the public health emergency. *See, e.g.*, ARP § 9401, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* § 9811(hh), 135 Stat. at 210-11 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act § 1109(h), 134 Stat. at 306 ("until the date on which the national emergency . . . expires"); Fiscal Responsibility Act of

2023, Pub. Law 118-5 (June 3, 2023) (rescinding $27 billion of appropriations deemed no longer necessary once the pandemic was over).

214.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Rescission Letter is contrary to law and in violation of the APA.

215.    Plaintiffs are also entitled to vacatur of the Rescission Letter and reinstatement of the prior extended liquidation periods pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunctions preventing Defendants from implementing, enforcing, or reinstating the Rescission Letter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

i.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside the Rescission Letter, and any other further actions taken by Defendants to implement or enforce the Rescission Letter;

ii.    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that the Rescission Letter is an unlawful act that violated the APA;

iii.    Preliminarily and permanently enjoin Defendants from implementing or enforcing the Rescission Letter or otherwise revoking ED's approvals of extension requests that extended the liquidation periods for Plaintiffs' ES funding through March 28, 2026;

iv.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v.    Grant other such relief as this court deems appropriate, just, and proper.


Respectfully submitted,

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s Andrew Amer*
Andrew Amer
  *Special Counsel*
Molly Thomas-Jensen
  *Special Counsel*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Stephen C. Thompson
  *Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6127
andrew.amer@ag.ny.gov

*Counsel for the State of New York*


**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By*:    /s/ Maureen C. Onyeagbako*
Maureen C. Onyeagbako*
  *Supervising Deputy Attorney General*
José Pablo Galán de la Cruz*
  *Deputy Attorney General*
Cheryl L. Feiner*
  *Senior Assistant Attorney General*
California Attorney General's Office
1300 I Street, Ste. 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone:  (916) 210-7324
Email:  Maureen.Onyeagbako@doj.ca.gov
       Pablo.Galan@doj.ca.gov
       Cheryl.Feiner@doj.ca.gov

*Counsel for Plaintiff State of California*


**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By: */s/ Alexa Salas*
Alexa Salas*
  *Assistant Attorney General*
Lauren Watford*
  *Assistant Attorney General*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Alexa.Salas@azag.gov
Lauren.Watford@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*


**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF THE STATE OF DELAWARE

By**:** */s/ Vanessa L. Kassab*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

By: */s/ Andrew Mendrala*
Andrew Mendrala*
   *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW Washington, DC
20001
(202) 724-9726
Andrew.Mendrala@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL FOR THE STATE OF
HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
   *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
   *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
ATTORNEY GENERAL FOR THE STATE OF
MAINE

By: */s/ Sarah A. Forster*
Sarah A. Forster*
   *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Sarah.Forster@maine.gov

*Counsel for the State of Maine*

**KWAME RAOUL**
ATTORNEY GENERAL FOR THE STATE OF
ILLINOIS

By: */s/ Elena S. Meth*
Cara Hendrickson*
   *Assistant Chief Deputy Attorney General*
Elena S. Meth*
   *Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 835-0182
Cara.Hendrickson@ilag.gov
Elena.Meth@ilag.gov

*Counsel for the State of Illinois*

**ANTHONY G. BROWN**
ATTORNEY GENERAL FOR THE STATE OF MARYLAND

By: */s/ Keith M. Jamieson*
Elliott Schoen\*
 *Principal Counsel*
 *Assistant Attorney General*
Alan J. Dunklow\*
 *Deputy Principal Counsel*
 *Assistant Attorney General*
Maryland State Department of Education
Keith M. Jamieson\*
 *Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us

*Counsel for the State of Maryland*


**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti
BreAnna Listermann\*
 *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

*Counsel for the People of the State of Michigan*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ David C. Kravitz*
David C. Kravitz\*
 *State Solicitor*
Katherine Dirks
 *Chief State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2427
david.kravitz@mass.gov

*Counsel for the
 Commonwealth of Massachusetts*


**KEITH ELLISON**
ATTORNEY GENERAL FOR THE STATE OF MINNESOTA
By: */s/ Liz Kramer*
Liz Kramer\*
 *Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*


**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
 *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

*/s/ Lauren E. Van Driesen*
Lauren E. Van Driesen
Jessica L. Palmer
Justine Longa*
  *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Lauren.VanDriesen@law.njoag.gov
Jessica.Palmer@law.njoag.gov
Justine.Longa@law.njoag.gov

*Counsel for the State of New Jersey*


**DAN RAYFIELD**
ATTORNEY GENERAL FOR THE STATE OF
OREGON

By:   */s/ Sara Van Loh*
Sara Van Loh OSB #044398*
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, Oregon 97201
Tel (971) 673-1880
Fax (971) 673-5000
Sara.VanLoh@doj.oregon.gov

*Attorneys for the State of Oregon*


**RAÚL TORREZ**
ATTORNEY GENERAL OF THE STATE OF NEW
MEXICO

*/s/ Anjana Samant*
Anjana Samant*
  *Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
asamant@nmdoj.gov
(505) 270-4332

*Counsel for the State of New Mexico*


**JENNIFER C. SELBER**
  *General Counsel*
Michael J. Fischer
  *Executive Deputy General Counsel*

By:*/s/ Thomas P. Howell*
Thomas P. Howell*
  *Deputy General Counsel*
Governor's Office of General Counsel
30 N. 3rd Street, Suite 200
Harrisburg, PA 17101
(717) 460-6786
thowell@pa.gov

*Counsel for Governor Josh Shapiro,*
*Commonwealth of Pennsylvania*


* Pro Hac Vice application to be filed