## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al*.,<br><br>Defendants. | Case No. 1:25-cv-02990 (ER)(BCM) |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 5

    A.    Congress Appropriated Funds to Mitigate the Immediate and Long-Term Devastating Impacts of the Pandemic on K-through-12 Students ...................................................................... 5

    B.    ED Granted Extensions Permitting Plaintiffs to Timely Seek Reimbursement Through March 2026 and Then Abruptly Rescinded the Extensions and Declared Plaintiffs' Liquidation Periods to Have Already Expired ............................. 7

    C.    Plaintiffs Have Suffered and Will Continue to Suffer Substantial Harm From Defendants' Rescission of ED's Prior Extension Approvals ........................................................ 10

ARGUMENT ..................................................................................................... 12

    I.    THIS COURT HAS JURISDICTION OVER THE STATES' CLAIMS ................................................................................. 12

    A.    The Tucker Act Does Not Apply ................................................. 12

    B.    Plaintiffs Have Standing ............................................................ 16

    II.    THE COURT SHOULD PRELIMINARILY ENJOIN DEFENDANTS FROM RESCINDING ED'S PRIOR EXTENSIONS APPROVALS AND DECLARING STATES' LIQUIDATION PERIODS TO HAVE ALREADY EXPIRED ............. 18

    A.    Plaintiffs Have a Strong Likelihood of Success on the Merits .................................................................................... 19

    B.    Plaintiffs Will Suffer Irreparable Harm Absent a PI ................... 25

    C.    The Public Interest and Balance of Equities Strongly Favor Granting a PI ............................................................................ 27

CONCLUSION .................................................................................................. 28

i

# TABLE OF AUTHORITIES

## **Cases**

*Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 1:25--00702 2025 WL
833917 (D. Md. Mar. 17, 2025)....................................................................... 25

*Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018)..................................................... 19

*Bennett v. Spear*, 520 U.S. 154 (1997) .................................................................. 19

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)................................................... *passim*

*Carson v. American Brands, Inc.,* 450 U.S. 79 (1981)................................................ 25

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016) ............................................ 17

*City & County of San Francisco v. USCIS*, 408 F. Supp. 3d 1057 (N.D. Cal. 2019).................. 25

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................ 16

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)............................. 26

*Deferio v. City of Syracuse*, 193 F. Supp. 3d 119 (N.D.N.Y. 2016)............................... 28

*Dep't of Com. v. New York*, 588 U.S. 752 (2019).............................................. 20, 21

*Dep't of Educ. v. California*, 604 U.S. ___, 2025 WL 1008354 (April 4, 2025) ................ 14, 15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................ 20, 21, 24

*Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505 (2d Cir.
2024) ................................................................................................ 18

*Encino Motorcars, LLC* v. *Navarro*, 579 U. S. 211 (2016)..................................... 21, 24

*FCC* v.*Fox Television Stations, Inc.*, 556 U. S. 502 (2009) ................................. 21, 24

*Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367 (2024) ....................... 18

*Food & Drug Admin. v. Wages and White Lion Investments, L.L.C.*, 604 U.S. ___,
2025 WL 978101 (April 2, 2025) ..................................................................... 21

*Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014) ............................... 15

*Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) ..................................... 26

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............. 27

*Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034 (2d Cir. 1995)................. 3, 12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................... 16, 17

*Massachusetts v. Sec'y of Health & Hum. Servs.*, 816 F.2d 796 (1st Cir. 1987)............... 15

*Md. Dep't of Hum. Resources v. Dep't of Health & Hum. Services,* 763 F.2d 1441
(D.C. Cir. 1985) .................................................................................... 13

*Mich. v. DeVos*, 481 F. Supp. 3d 984 (N.D. Cal. 2020) ...................................... 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.
29 (1983).......................................................................................... 21

*New York v. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020)................................ 20

*New York v. Trump*, No. 25-1236, 2025 WL 914788 (1st Cir. Mar. 26, 2025)........................ 20

*New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766 (S.D.N.Y. 2018)........................ 16

*New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279 (S.D.N.Y. 2020).................................... 19

*New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020)...................................... 18

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................ 27

*Nnebe v. Daus*, 510 F. Supp. 3d 179 (S.D.N.Y. 2020) .............................................................. 19

*Nnebe v. Daus*, No. 21-170-CV, 2022 WL 1220204 (2d Cir. Apr. 26, 2022).............................. 19

*Packard Elevator v. ICC*, 782 F. 2d 112 (8th Cir. 1986) .......................................................... 25

*Planned Parenthood of N.Y.C. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp.
    3d 308 (S.D.N.Y. 2018)........................................................................................................ 27

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................. 28

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ................................................................ 28

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ...................................................................... 17

*Russello v. United States*, 464 U.S. 16 (1983) ............................................................................ 25

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................................ 21, 27

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................................................... 16

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) .............................................. 18

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................................................... 16

*Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024)........................................................ 25

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) ..................................................................... 27

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................................... 18, 27

## **Statutes**

20 U.S.C. § 1225(b) ...................................................................................................................... 8

5 U.S.C. § 701 ............................................................................................................................. 20

5 U.S.C. § 702 ............................................................................................................................... 3

5 U.S.C. § 705 ............................................................................................................................. 19

American Rescue Plan Act of 2021 ("ARP"), Pub. L. No. 117-2 (2021) .................... 5, 6, 23, 24

Coronavirus Response and Relief Supplemental Appropriations Act of 2021, Pub.
    L. No. 116-260................................................................................................................ 5, 6, 23

Fiscal Responsibility Act of 2023, Pub. Law 118-5 (June 3, 2023) ............................................ 24

Fiscal Responsibility of Act of 2023, Pub. L. 118-5 .................................................................... 7

**Rules**

Fed. R. Civ. P. 65(b)(1)................................................................................................. 18

**Regulations**

2 C.F.R. § 200.344(c)........................................................................................... 8, 15, 20

**Other Authorities**

N.Y. State Dep't of Educ., American Rescue Plan Elementary and Secondary
    School Emergency Relief (ARP-ESSER) Fund, https://www.nysed.gov/federal-
    education-covid-response-funding/american-rescue-plan-elementary-and-
    secondary-school ................................................................................................... 6

Senate Report 118-84, Committee on Appropriations 253 (July 27, 2023) ................................. 7

U.S. Dep't of Educ., An Overview of ARP-HCY State Plans (May 2022),
    https://files.eric.ed.gov/fulltext/ED628077.pdf ...................................................... 6

U.S. Dep't of Educ., Emergency Assistance to Non-Public Schools (ARP-EANS),
    https://www.ed.gov/grants-and-programs/formula-grants/response-formula-
    grants/covid-19-emergency-relief-grants/emergency-assistance-to-non-public-
    schools .................................................................................................................... 6

## INTRODUCTION

During the COVID-19 pandemic, Congress enacted numerous major appropriations laws to respond to the nationwide health crisis and resulting economic devastation and place the nation on a path to recovery once the pandemic ended. Among these laws were the Coronavirus Response and Relief Supplemental Appropriations Act of 2021 ("CRRSA"), and the American Rescue Plan Act of 2021 ("ARP"), which collectively appropriated more than $250 billion in education stabilization ("ES") funding to address pandemic-related problems devastating the country's state education systems. The critical education investments implemented through ES funding focused on addressing the impact of lost instructional time through interventions such as summer learning and afterschool programs, along with other initiatives to mitigate the devastating effects of the pandemic on K-12 students.

As detailed in the supporting declarations,[1] the 17 Plaintiffs[2] were collectively awarded over $1 billion dollars in ES funding—monies relied on by their state education departments and local school districts to enter into contracts with service providers and hire staff to provide critical education-related programs and services designed, as Congress intended, to address problems that had emerged during the pandemic but did not end once the public health emergency ended. For the final tranche of ES grants appropriated under ARP, under applicable law and regulations

---

[1] A table listing the 17 declarations filed by Plaintiffs in support of their motion is attached as Exhibit A.

[2] Plaintiffs are: New York, Arizona, California, the District of Columbia, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, People of the State of Michigan, Minnesota, New Jersey, New Mexico, Nevada, Oregon, and Josh Shapiro, in his official capacity as the Governor of the Commonwealth of Pennsylvania.

Plaintiffs had until January 28, 2025, to request reimbursements from Defendant U.S. Department of Education ("ED") from their ARP ES funding (the "liquidation period").

In late 2024 and early 2025, long after the federal government had declared that the COVID-19 pandemic was over, ED extended Plaintiffs' liquidation periods for ARP awards through March 2026. ED granted these extensions based on findings that Plaintiffs had submitted sufficient justification and documentation to warrant granting additional time, consistent with Congress's intent that states be afforded reasonable opportunity to draw down on their ES funds.

However, on March 28, 2025—long before the expiration of Plaintiffs' window to access funds awarded under ARP—Defendants abruptly and arbitrarily rescinded all of ED's prior extension approvals and deemed the window for Plaintiffs to draw down ES funds to have *already expired*, throwing into chaos a wide range of critical education programs and services needed to combat the long-term effects of the pandemic.[3] The sole stated basis for ED's change in position was that the ES funding was appropriated through a COVID-19 related law and, according to Defendants, because "the COVID pandemic ended" any extension was suddenly "not consistent with the Department's priorities and thus not a worthwhile exercise of its discretion." *See* March 28, 2025, Letter from Secretary McMahon to State Chiefs of Education (the "Rescission Letter"), Complaint ("Compl.") at Ex. A (ECF No. 1-1).

Plaintiffs bring this action against ED and Education Secretary Linda McMahon for preliminary and permanent injunctive relief to prevent them from rescinding ED's prior approvals

---

[3] Defendants' rescission also applied to the penultimate tranche of ES grants authorized by CRRSA, which could be used to pay for obligations incurred under contracts entered into on or before September 30, 2023. Maryland, Michigan, and Pennsylvania have yet to liquidate all of their CRRSA obligations; their deadline to request reimbursement for CRRSA grants had been extended by ED until March 31, 2025. *See* Wright-MD ¶¶ 7–9; Rice-MI ¶10.

of Plaintiffs' extension requests and declaring Plaintiffs' liquidation periods to have already expired. Plaintiffs also seek injunctive relief reinstating the previously-granted extensions for them to liquidate their ES funding. And Plaintiffs seek a declaration that ED's change in position on Plaintiffs' previously-approved extension requests violates the Administrative Procedures Act ("APA").

Plaintiffs are entitled to a preliminary injunction ("PI") barring Defendants from enforcing the Rescission Letter against them or otherwise rescinding ED's prior approval of their extension requests to maintain the *status quo* pending resolution of this action.

As a threshold matter, this Court has jurisdiction to review Defendants' final agency action under the APA, which waives the federal government's sovereign immunity for claims seeking relief other than "money damages." 5 U.S.C. §702. This action seeks to vacate ED's determination to rescind the extension approvals it previously granted and declare Plaintiffs' liquidation period already expired, not an award of "money damages." That the requested relief may result in Plaintiffs submitting timely payment requests on their ES funding does not convert this case to one seeking "money damages"; it is settled law that district courts have jurisdiction over challenges to final agency action under APA §702, even when a remedial order may result in the disbursement of funds. *See Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988); *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1042 (2d Cir. 1995). Nor is there any serious doubt that Plaintiffs have Article III standing to bring this challenge. Absent relief, Plaintiffs will lose funding, lay off staff, and cut programs and services. This is concrete injury directly traceable to Defendants' Rescission Letter and likely to be redressed by a favorable judicial decision vacating the rescission of ED's prior extension approvals and restoring Plaintiffs' extended liquidation periods.

Moreover, all the factors for granting a PI tip decidedly in Plaintiffs' favor.

3

*First*, Plaintiffs are likely to succeed on the merits because ED's change in position is arbitrary and capricious and unlawful in violation of the APA as it: (1) assumes incorrectly that all ES appropriations were intended only for use during the pandemic; (2) lacks any reasoned explanation, with Defendants' sole purported justification being that the pandemic ended (which occurred long before ED approved Plaintiffs' extension requests); (3) ignores Plaintiffs' substantial reliance interests on the approved extensions; and (4) contravenes Congress' intent to use ES funding to mitigate the pandemic's long-term effects.

*Second*, Plaintiffs will suffer irreparable harm absent immediate relief. Defendants' sudden termination of Plaintiffs' liquidation period has already caused, and will continue to cause, immediate and devastating harm to Plaintiffs, their local school districts, their residents, and the public. Defendants' action deprives Plaintiffs of the previously-approved extensions of time to access hundreds of millions of dollars in critical ES funding, on which Plaintiffs' and their local school districts' budgets have relied to implement programs and services that address ongoing and emerging educational needs of students and local school districts, and which Plaintiffs need to fulfill their duty to provide for the educational needs of their student populations. Absent preliminary injunctive relief, Plaintiffs will be unable to make timely requests for funds needed to provide essential public education services for their K-12 students, pay staff, satisfy obligations to public and private partners, and otherwise mitigate the pandemic's long-term devastating effects on public and private education.

*Third*, the balance of equities tips in favor of Plaintiffs, and a PI is in the public interest. Plaintiffs have shown an overwhelming likelihood of prevailing on the merits in challenging ED's drastic change in position, which strongly indicates that a PI would serve the public interest. Conversely, there is no public interest served by perpetuating ED's unlawful agency action. And

Defendants suffer no harm from a PI that merely preserves the *status quo* by halting implementation of the agency's unlawful change in position.

## BACKGROUND

### A. Congress Appropriated Funds to Mitigate the Immediate and Long-Term Devastating Impacts of the Pandemic on K-through-12 Students

From 2020 to 2021, Congress enacted numerous major appropriations laws to, among other things, provide funding to Plaintiffs to bolster the health (both physical and mental) and education of students across the country during and after the COVID-19 pandemic. The primary appropriations law at issue here is the American Rescue Plan Act of 2021 ("ARP"), Pub. L. No. 117-2 (2021), enacted in March 2021.[4]

ARP established, and appropriated moneys for, three ES funds: (i) the Elementary and Secondary School Emergency Relief ("ESSER") program, *id*. §2001; (ii) the Homeless Children and Youth ("HCY") program, *id*. §2001(b)(1); and (iii) the Emergency Assistance to Nonpublic Schools ("EANS") program, *id*. §2002. The critical education investments implemented through these ES funds focused on: (i) supporting the safe return to in-person instruction and continuity of services; (ii) addressing the impact of lost instructional time through implementation of evidence-based interventions, such as summer learning or summer enrichment, extended day, comprehensive afterschool programs, and extended school year programs; (iii) ensuring that such interventions respond to students' academic, social, and emotional needs; (iv) addressing the disproportionate impact of the coronavirus on economically disadvantaged students, children with disabilities, English learners, racial and ethnic minorities, migrant students, students experiencing

---

[4] As noted *supra* n. 3, some of the relevant ES grants to Maryland, Michigan, and Pennsylvania were authorized under a different appropriations law, the Coronavirus Response and Relief Supplemental Appropriations Act of 2021, Pub. L. No. 116-260, enacted in December 2020.

homelessness, and children and youth in foster care; (v) providing services and assistance to eligible non-public schools significantly impacted by the pandemic, including those with high percentages of low-income students; and (vi) addressing the urgent needs of homeless children and youth exacerbated by the pandemic.[5]

In appropriating moneys for these programs, Congress did not intend that the ES funding end concurrently with the COVID-19 emergency. *First*, there is no language in ARP or CRRSA tying distribution of ES funding to the pendency of the pandemic. Rather, Congress specified that funds appropriated were "to remain available" for obligations incurred through specific dates regardless of when the pandemic was declared over. ARP §2001(a) (obligations incurred "through September 30, 2023"); CRRSA §311 (obligations incurred "through September 20, 2022"). Moreover, Congress specified that the ES funds be made available to mitigate the deleterious effects of the pandemic extending *beyond* the period of the declared health emergency due to "learning loss" suffered by students. *E.g.*, ARP §2001(d)(1); CRRSA §313(d)(13). In ARP, for example, Congress required that "not less than 20 percent" of the ES funds be used to implement "evidence-based interventions, such as summer learning or summer enrichment, extended day, comprehensive afterschool programs or extended school year programs," to ensure that state educational departments "respond to students' academic, social, and emotional needs and address

---

[5] *See, e.g.*, N.Y. State Dep't of Educ., American Rescue Plan Elementary and Secondary School Emergency Relief (ARP-ESSER) Fund, https://www.nysed.gov/federal-education-covid-response-funding/american-rescue-plan-elementary-and-secondary-school; U.S. Dep't of Educ., Emergency Assistance to Non-Public Schools (ARP-EANS), https://www.ed.gov/grants-and-programs/formula-grants/response-formula-grants/covid-19-emergency-relief-grants/emergency-assistance-to-non-public-schools; U.S. Dep't of Educ., An Overview of ARP-HCY State Plans (May 2022), https://files.eric.ed.gov/fulltext/ED628077.pdf.

the disproportionate impact of the coronavirus on . . . students experiencing homelessness, and children and youth in foster care." ARP §2001(d)(1).

*Second*, Congress did not take any action to rescind the ES funding appropriations when the federal government declared the pandemic over in May 2023, as Congress did for other appropriations. *See, e.g.*, Fiscal Responsibility of Act of 2023, Pub. L. 118-5, Div. B, Title I (rescinding some appropriations after pandemic declared over while keeping others in place, including funding at issue here).

*Third*, in 2023, the Senate Committee on Appropriations encouraged ED "to extend the period for liquidating financial obligations incurred under grants awarded by" ED, to "announce its policy and process as soon and transparently as possible," and to "ensure that its process … minimizes the administrative burden [on recipients] to the extent practicable, including by not requiring excessive documentation." Senate Report 118-84, Committee on Appropriations 253 (July 27, 2023) ("Committee on Appropriations Report"), available at https://perma.cc/BGA9-XFBP.

## B.  ED Granted Extensions Permitting Plaintiffs to Timely Seek Reimbursement Through March 2026 and Then Abruptly Rescinded the Extensions and Declared Plaintiffs' Liquidation Periods to Have Already Expired

In total, Plaintiffs were awarded over $50 billion in ES funding. Compl. ¶46 (chart). This ES funding falls into two broad categories: (1) programmatic funds, which flow through state education agencies ("SEAs") to local education agencies ("LEAs") to pay for the various projects, facility upgrades, and support services for which Congress specified the funds were to be used; and (2) administrative funds, which flow to the SEAs to cover the cost of managing and distributing the programmatic funds to the LEAs, *i.e.*, to cover overhead and salaries of dedicated state staff necessary to administer the ES funding programs, services, and projects run by the LEAs. *See, e.g.*, Coughlin-NY ¶55-57.

7

The grants awarded by ED to Plaintiffs for the ARP ESSER, HCY, and EANS programs were initially available to Plaintiffs to fund obligations incurred under contracts entered into through September 30, 2023. ARP §2001(a). Under applicable regulations, Plaintiffs had 120 days from September 30, 2023, to draw down on, or liquidate, their awards. *See* 2 C.F.R. §200.344(c) ("The recipient must liquidate all financial obligations incurred under the Federal award no later than 120 calendar days after the conclusion of the period of performance."). But each State was entitled to an additional year—to September 30, 2024—in which to incur obligations eligible for funding under these programs in accordance with the "Tydings amendment," Section 421(b) of the General Educational Provisions Act, codified at 20 U.S.C. §1225(b). Plaintiffs thus had until January 28, 2025 (120 days from September 30, 2024) to liquidate their ARP ES funds obligated under contracts entered into on or prior to September 30, 2024.

Beginning in September 2023, and in response to Congress's urging, ED solicited extension requests from SEAs in accordance with ED's discretionary authority to grant extensions of the period within which Plaintiffs can draw down awarded funds (the "liquidation period") under 2 C.F.R. §200.344. *See* Compl. ¶¶41-43; Committee on Appropriations Report at 253 (encouraging ED to extend liquidation periods through a process imposing minimal burden on recipients). Each Plaintiff submitted to ED a form (provided by ED) detailing unliquidated grant amounts already obligated as of September 30, 2024; what subrecipients (*i.e.*, particular schools or contractors) they would fund; how the funds would be used; and the reason(s) for the extension request.[6] ED granted each State's extension request, based on specific findings that the requesting

---

[6] *See, e.g.*, Coughlin-NY ¶37; Wright-MD ¶¶7–8; Rice-MI ¶¶9, 11; Bell-MA ¶¶7-8, 13-14; Seaton-IL ¶¶13,15; Stewart-DC ¶¶6-8; Chasse Johndro-ME, ¶4; Rowe-PA ¶¶8, 15, 24-25; Wetherell-OR ¶¶8-9, 12; Ehling-NJ ¶10; Pierson-CA ¶¶6, 7, 10; Portner-HI ¶7; *see also* Perkins-Cohen-MD ¶¶4–6.

State had submitted sufficient justification and documentation to warrant granting the extension and setting the new liquidation deadline to be March 2026,[7] with only one exception.[8] Accordingly, Plaintiffs understood that they had until March 2026 to draw down on their ES funding for amounts paid under contracts entered into by September 30, 2024 (covering at least the 2024-2025 academic year), and their SEAs and LEAs relied on that understanding in creating budgets, hiring staff, undertaking facility upgrade projects, and planning programs and services for children and families.[9]

But ED abruptly changed course at 5:03pm ET on March 28, 2025, when ED's Office of Communications and Outreach sent a mass email to all "Chief State School Officers"—including each Plaintiff—attaching the Rescission Letter from Secretary McMahon. *See* Compl., Ex. A. The Rescission Letter, also dated March 28, 2025, stated that ED was "modifying the liquidation period to end on March 28, 2025, at 5:00pm ET" instead of *one year later* per the extension approvals, based on Defendants' conclusion that ED's prior extension approvals were suddenly "not justified." *Id.* at 1. In other words, Plaintiffs were notified by Secretary McMahon that their

---

[7] *See, e.g.*, Coughlin-NY ¶¶14, 20, 26, 36-38; Wright-MD ¶¶7–9; Rice-MI ¶¶11-13; Bell-MA ¶¶9, 15; Seaton-IL ¶¶14,16; Stewart-DC ¶¶6-8; Chasse Johndro-ME ¶5-6; Rowe-PA ¶¶8, 12; Wetherell-OR ¶¶8-9; Ehling-NJ ¶¶11–14; Padilla-NM ¶¶6, 13, 19; Portner-HI ¶8; Marten-DE ¶11.

[8] For California's EANS award, ED extended the liquidation period only through December 2025. Pierson-CA ¶6. As this is the only ARP award for which ED did not extend the liquidation period through March 2026, Plaintiffs will refer to their approved liquidation periods as extending through March 2026 with the caveat noted here that there is this one exception.

[9] *See, e.g.*, Coughlin-NY ¶43; Slaga-AZ ¶¶10-15; Wright-MD ¶¶7–9; Rice-MI ¶21; Bell-MA ¶¶12, 18 (noting that Massachusetts was reassured as recently as February 12, 2025, that access to EANS and ESSER funds would be available through March 28, 2026); Seaton-IL ¶¶4, 23-24; Stewart-DC ¶¶6-8; 11-12; Rowe-PA ¶¶20, 22-28; Wetherell-OR ¶¶8-12, 21-22; Ehling-NJ ¶¶11–14; Padilla-NM ¶¶6, 17, 21; Pierson-CA ¶¶6-12; Portner-HI ¶8; Marten-DE ¶12; *see also* Perkins-Cohen-MD ¶¶5, 12–13.

previously approved extensions were rescinded and their liquidation periods for accessing their ES funding were deemed to have *already expired* effective three minutes prior to their receipt of the Secretary's letter.

The rescission was not specific to any State's particularized extension request or the terms and conditions of their awards, but instead was a categorical revocation of all previously granted extensions. By way of reasoning, Secretary McMahon offered only that "[e]xtending deadlines for COVID-related grants … years after the COVID pandemic [had already] ended is not consistent with [ED's] priorities and thus not a worthwhile exercise of its discretion." *Id.* The Rescission Letter also advised that ED found "any reliance interests developed" by ES funding recipients based on those prior extension approvals to be "minimal" and "unreasonable," stating that, because the extension approvals were a matter of agency discretion, ES funding recipients "could not rely on [ED] adhering to its original decision." *Id.*

As of March 28, 2025, Plaintiffs collectively had just over $1 billion in unliquidated ES funds remaining on their ESSER, HCY, and EANS grants that, until they received the Rescission Letter, they understood and believed they could access through March 2026.[10]

## C. Plaintiffs Have Suffered and Will Continue to Suffer Substantial Harm From Defendants' Rescission of ED's Prior Extension Approvals

Defendants' sudden rescission of ED's prior extension approvals and determination that Plaintiffs' liquidation periods have already expired has had immediate adverse consequences .

---

[10] This amount is the total unliquidated ARP ES funding amounts for each State as of March 28, 2025, which excludes the CRRSA funds that Maryland, Michigan, and Pennsylvania had not yet liquidated as of that date (which had a liquidation period through March 2025 rather than March 2026). *See* Compl. ¶46 (chart); Wright-MD ¶8; Rice-MI ¶10; Rowe-PA ¶23.

*First*, the Rescission Letter has blocked Plaintiffs from submitting payment requests to access the remaining unliquidated administrative portions of their ES funding, monies that are paid directly to the SEAs to cover the cost of managing and distributing the programmatic funds, *i.e.*, to cover overhead, including the salaries of dedicated support staff, and other expenses necessary to administer the ES funding programs. Compl. ¶39. As of the date ED sent the Rescission Letter, the amount of Plaintiffs' unliquidated administrative portions of their ES funding was over $28 million.[11] As a result of Defendants' unlawful Rescission Letter, some of the SEAs have had to lay off or furlough staff dedicated to administering the ES funding programs, or anticipate doing so in the near future.[12]

Second, because the Rescission Letter has blocked Plaintiffs from submitting payment requests to access the remaining unliquidated programmatic portions of their ES funding, their SEAs and LEAs have already had—or anticipating having in the near future—to terminate contracts with vendors and other partners (some of whom had already broken ground on capital improvement projects, like the installation of new ventilation equipment) that were being paid exclusively with programmatic ES funding.[13] Notably, many of the programs that have been, or soon will be, discontinued due to the Rescission Letter are intended to compensate for lost

---

[11] Coughlin-NY ¶42; Wright–MD ¶¶8, 10; Rice-MI ¶24; Stewart-DC ¶¶10-11; Rowe-PA ¶23; Wetherell-OR ¶14; Ehling-NJ ¶¶11-12; Maestretti-CA ¶6; Portner-HI ¶9; Marten-DE ¶13.

[12] Coughlin-NY ¶55-57; Seaton-IL ¶¶25(c),(f).

[13] Coughlin-NY ¶50-54; Slaga-AZ ¶¶26-27; Wright-MD ¶9; Perkins-Cohen-MD ¶¶13–15; Rice-MI ¶25; Seaton-IL ¶25(a); Rowe-PA ¶¶24, 25, 28; Maestretti-CA ¶7 (explaining that LEAs, school districts, and vendors have all communicated with CDE "understandably confused and panicked about the possibility of non-payment for services and inability to continue ARPA-funded programs").

instruction time during the pandemic, such as summer school and extended day programs.[14] Plaintiffs need these programs *now* to mitigate the pandemic's long-term effects on students' educational achievement; even if these programs can be re-established following the successful resolution of this action, students and schools will be harmed from the delay in providing them with this additional instruction time.[15] And there is no guarantee that vendors and staff who have worked on these projects will be willing or able to pick up where they left off should the projects be restarted following the entry of final judgment in Plaintiffs' favor.[16]

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION OVER THE STATES' CLAIMS

### A.  The Tucker Act Does Not Apply

Defendants will likely argue—as the federal government has in other matters—that because this case relates to federal grants, the Court of Federal Claims has exclusive jurisdiction to hear this matter under the Tucker Act. Defendants' argument contravenes the general rule that district courts have jurisdiction over challenges to final agency action under §702 of the APA, including when a remedial order may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988); *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1042 (2d Cir. 1995) (citing *Bowen* in rejecting argument that agency's refusal to allow reimbursement under

---

[14] Coughlin-NY ¶50-54; Slaga-AZ ¶¶11, 14; Wright-MD ¶6; Perkins-Cohen-MD ¶¶6–7; Bell-MA ¶22; Seaton-IL ¶¶24,25(a)-(g); Stewart-DC ¶¶5, 12; Chasse Johndro-ME ¶9, 14, 18; Rowe-PA ¶25; Ehling-NJ ¶7; Pierson-CA ¶¶14-16; Marten-DE ¶7.

[15] Coughlin-NY ¶54; Slaga-AZ ¶¶11, 14, 28; Wright-MD ¶11; Perkins-Cohen-MD ¶¶6–7, 15–16; Rowe-PA ¶¶25-27; Marten-DE ¶¶7-8; see also Pierson-CA ¶¶14-16.

[16] Coughlin-NY ¶76; Slaga-AZ ¶27; Perkins-Cohen-MD ¶15; Stewart-DC ¶12; Chasse Johndro-ME ¶17; Rowe-PA ¶¶25-26.

statutory entitlement was a claim for money damages outside the scope of the APA's sovereign immunity waiver under §702).

*Bowen* is directly on point. That case involved the federal contribution to state Medicaid programs. 487 U.S. at 883. The Secretary of Health and Human Services ("HHS Secretary") disallowed reimbursement to Massachusetts for certain services. *Id.* at 887. Massachusetts sued the HHS Secretary, challenging the determination under §702 of the APA. *Id.* In the Supreme Court, the HHS Secretary argued that the Court of Federal Claims had exclusive jurisdiction over Massachusetts's claim. *Id.* at 890-91.

The Supreme Court held that reversing a disallowance decision by the Secretary, which resulted in the payment of money by the United States, was not "money damages" precluding the exercise of jurisdiction by the district court under §702 of the APA. *Id.* at 893. The Court emphasized that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893. Rather, the relevant inquiry is whether the remedy is a "'*substitute* for a suffered loss,'" or "'the very thing to which [the plaintiff] was entitled'" in the first place. *Id.* at 895 (quoting *Md. Dep't of Hum. Resources v. Dep't of Health & Hum. Services,* 763 F.2d 1441, 1446 (D.C. Cir. 1985)). In rejecting the Secretary's position, the Court drew a critical distinction between a claim for "money damages" and a claim for "monetary relief," finding §702 only precluded review under the APA of the former:

> There is no evidence that any legislator . . . understood the words "money damages" [in §702] to have any meaning other than the ordinary understanding of the term as used in the common law for centuries. No one suggested that the term was the functional equivalent of a broader concept such as "monetary relief" and no one proposed that the broader term be substituted for the familiar one.

*Id.* at 897. Based on this distinction, the Court held that the state's suit to enforce a statutory entitlement to reimbursement "is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id*. at 900 (emphasis in original). "The fact that the mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief." *Id.* at 900-01.

The same reasoning applies here. Plaintiffs do not seek an award of money damages to compensate them for ED's refusal to disburse their ES funding. Rather, as in *Bowen*, they seek "to hold unlawful and set aside agency action" that rescinded ED's prior extension approvals and declared Plaintiffs' liquidation periods to have already expired, thereby terminating Plaintiffs' ability to submit timely payment requests through March 2026. *Id.* at 910. This Court, as the "reviewing court," has "jurisdiction under §702 to review" Defendants' final agency action set forth in the Rescission Letter and to grant Plaintiffs "the complete relief authorized by § 706." *Id*.

The Supreme Court's recent motion order granting a stay in *Dep't of Educ. v. California*, 604 U.S. ___, 2025 WL 1008354 (April 4, 2025), does not require a different result.

*First*, the Court's stay order, issued "with barebones briefing, no argument, and scarce time for reflection," 2025 WL 1008354 at *2 (Kagan, dissenting), does not overrule *Bowen*; indeed, the majority cites to *Bowen* as controlling law, *id*. at *1 (per curiam).

*Second*, the stay order noted that the Tucker Act "grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States," *id.* at *1 (internal quotations omitted), and appeared to conclude that the district court's PI "enforc[ed] a contractual obligation to pay money," *id.* at *1-2.  Here, ED granted extensions pursuant to its

14

regulatory authority under 2 C.F.R. §200.344(c), and in purporting to rescind those extensions, Defendants have invoked the administrative law principle that "an agency may reconsider its prior decision," ECF No. 1-1, at 1 & n.1 (citing *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)). This case, in other words, is an administrative law case, not a contract case, and does not turn on the particular terms and conditions of ED's grant awards. And Plaintiffs' accompanying proposed PI Order (attached as Exhibit B) requires maintaining the *status quo* of the previously granted extensions; it does not require the payment of past-due obligations. *See Bowen*, 487 U.S. at 910 ("[S]ince the orders are for specific relief (they undo the Secretary's refusal to reimburse the State), rather than for money damages (they do not provide relief that substitutes for that which ought to have been done), they are within the District Court's jurisdiction under §702's waiver of sovereign immunity.").

*Third*, as in *Bowen*, this case involves a decision by an agency head that categorically rescinds previously approved extensions across an entire grant program. Such a decision "represents an ongoing policy that has significant prospective effect," *see Bowen*, 487 U.S. at 889 (quoting *Massachusetts v. Sec'y of Health & Hum. Servs.*, 816 F.2d 796, 799 (1st Cir. 1987), *aff'd in part, rev'd in part sub nom. Bowen v. Massachusetts*, 487 U.S. 879 (1988)), and "reviewing the Secretary's interpretation of federal law" in that context is precisely the task that *Bowen* deemed appropriate for APA review. *Id.* at 909–10.

*Fourth*, the stay order accepted an unsubstantiated contention that the "Respondents have represented in this litigation that they have the financial wherewithal to keep their programs running." 2025 WL 1008354 at *1. Here, the record establishes that Defendants' actions prevent Plaintiffs from submitting timely payment requests for hundreds of millions of dollars of awarded ES funds, requiring them to cut programs and services and lay off staff because they do *not* have

15

the "financial wherewithal" to keep these programs and services running or all of their employees on the payroll.[17] As the Court held in *Bowen*, that Plaintiffs may later receive money as the result of an order vacating agency action is of no import: "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893.

### B. Plaintiffs Have Standing

To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

To establish injury-in-fact, a plaintiff must demonstrate an injury that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "A plaintiff may allege a future injury if he or she shows that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 782 (S.D.N.Y. 2018) (cleaned up) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) and *Clapper*, 568 U.S. at 409, 414 n.5 (2013)).

Here, Plaintiffs have suffered a "concrete, particularized" injury because prior to March 28, 2025, they had a one-year window to access over $1 billion in unliquidated ES funds remaining on their ESSER, HCY, and EANS grants, including over $28 million in administrative funds—monies that are paid directly to Plaintiffs to cover the SEA's cost of managing and distributing the

---

[17] *See, supra*, at Background C; *see also* Coughlin-NY ¶¶50-57, 52, 59; Slaga-AZ ¶¶19-28; Wright-MD ¶¶10 & 12; Perkins-Cohen-MD ¶¶12–15; Rice-MI ¶¶22-25; Seaton-IL ¶¶18, 25; Stewart-DC ¶11; Chasse Johndro-ME ¶36; Rowe-PA ¶30; Wetherell-OR ¶25; Ehling-NJ ¶20; Marten-DE ¶13.

programmatic funds. *See, supra*, at n.10-11. Without access to their administrative ES funding, Plaintiffs have laid off, and will continue to lay off, state employees who are dedicated to administering the ES funding programs. *Id.* at n.12. Moreover, without the ability to access the remaining unliquidated programmatic portions of the ES funding, Plaintiffs' SEAs and LEAs have already had—or anticipate having in the near future—to terminate contracts with vendors and other partners, or had counterparties refuse to perform, terminating services, programs, and facility upgrades needed to address the pandemic's ongoing effects on K-through-12 students, with many of the programs that have been, or soon will be, discontinued being those intended to compensate for lost instruction time during the pandemic.[18] Many of the counterparties, including education services providers, have incurred costs for which the SEAs can no longer seek reimbursement from ED due to the Rescission Letter, which potentially exposes SEAs to litigation and the attendant expense.[19]

In addition to establishing injury-in-fact, a plaintiff must also demonstrate that his or her injury is "fairly traceable" to the defendant's challenged actions. *Lujan*, 504 U.S. at 560 (cleaned up). In other words, a plaintiff "must demonstrate a causal nexus between the defendant's conduct and the injury." *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). Here, Plaintiffs' inability to access their ES funding is "fairly traceable" to Defendants' actions because it is Defendants' rescission of the extension approvals permitting drawdowns through March 2026 and their determination that Plaintiffs'

---

[18] Coughlin-NY ¶¶58-61; *See* Perkins-Cohen-MD ¶15; Rice-MI ¶25; Chasse Johndro-ME ¶10, 16, 17, 19; Rowe-PA ¶26; Wetherell-OR ¶37; Maestretti-CA ¶6; Pierson-CA ¶14, 15.

[19] *See, e.g.*, Coughlin-NY ¶59 (noting SEA's exposure of approximately $42.3 million in liability to education services providers for their services rendered prior to March 28, 2025).

liquidation periods have already expired, as set forth in the Rescission Letter, that have resulted in the termination of Plaintiffs' access to their ES funding. Indeed, but for Defendants' agency action, Plaintiffs and their local districts would have the continued ability to access their remaining ES funding through March 2026.

"The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008)). If a defendant's action causes an injury, enjoining the action will typically redress that injury. *See All. For Hippocratic Med.*, 602 U.S. at 380–81. And the injunction need not "completely redress the asserted injury," only to a sufficient degree to eliminate any effects of the challenged conduct. *Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 521 (2d Cir. 2024). That is the case here. Plaintiffs' injury is caused by the rescission of the prior extension approvals and determination that their liquidation periods to draw down on their ES funding have already expired. It inexorably follows that enjoining these actions will redress Plaintiffs' harm and permit them to request reimbursement, as they had been doing prior to Defendants' issuance of the Rescission Letter.

## II.    THE COURT SHOULD PRELIMINARILY ENJOIN DEFENDANTS FROM RESCINDING ED'S PRIOR EXTENSIONS APPROVALS AND DECLARING STATES' LIQUIDATION PERIODS TO HAVE ALREADY EXPIRED

A preliminary injunction is warranted where the moving party establishes that: (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020); *see also Nnebe v. Daus*, 510 F. Supp. 3d 179,

189 (S.D.N.Y. 2020), *aff'd mem.,* No. 21-170-CV, 2022 WL 1220204 (2d Cir. Apr. 26, 2022) (summary order). In addition, the APA authorizes courts "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. §705. The standard for a stay under 5 U.S.C. §705 is the same as the standard for a preliminary injunction. *See New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 104-05 (D.D.C. 2018).

All factors strongly weigh in favor of Plaintiffs. Accordingly, this Court should enter a PI to enjoin Defendants from rescinding the previously-approved extension requests and determining Plaintiffs' liquidation periods have already expired.

### A.  Plaintiffs Have a Strong Likelihood of Success on the Merits

As detailed below, Defendants' abrupt rescission of ED's extension approvals and determination that Plaintiffs' liquidation periods have already expired are final agency actions that violate the APA.

### 1.  *Defendants' Rescission Letter Constitutes Final Agency Action Subject to Judicial Review Under the APA*

The challenged rescission of the prior extension approvals and determination that Plaintiffs' liquidation periods have already expired—one year earlier than permitted by the extensions—constitute final agency actions subject to review under the APA.

Final agency actions "mark the consummation of the agency's decisionmaking process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted). The rescission of ED's prior extension approvals and determination that Plaintiffs' liquidation periods have already expired meet both prongs. First, the rescission and determination "mark the consummation" of Defendants' decision-making process because they announce the agency's

decision to terminate, with immediate effect, the prior extension approvals and deem the liquidation periods to have already expired. Rescission Letter at 1 ("[T]he Department has reconsidered" the "previously granted" liquidation extension request and "is modifying the liquidation period to end on March 28, 2025" because "further extension of the liquidation period" is "not justified."). Moreover, Plaintiffs are permitted to bring this challenge to both the rescission of the extension approvals and determination that the liquidation periods have already expired— both agency determinations set forth in the Rescission Letter—in a single action. *New York v. Trump*, __ F.4th__, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

Nor are Defendants' rescission of ED's prior extension approvals and determination that the liquidation periods have already expired part of the narrow class of agency actions that are "committed to agency discretion by law" and unreviewable in federal court. *See* 5 U.S.C. §701(a)(2). Where, as here, there are applicable statutory or regulatory standards that cabin agency discretion, *see* 2 C.F.R. §200.344, there are "meaningful standard[s] by which to judge the [agency]'s action," and the actions are reviewable. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019).

### 2. *Defendants' Change in Position Violates the APA*

The APA directs courts to set aside a final agency action that is not the product of "reasoned decisionmaking" and is "arbitrary and capricious." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). The Court's review under this standard must ensure that the agency has provided a genuine justification that supports its actions. *New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 81 (2d Cir. 2020). The arbitrary and capricious standard "is not limited to formal rules or official policies and applies equally to practices implied from agency conduct." *Saget v.*

*Trump*, 375 F. Supp. 3d 280, 355 (E.D.N.Y. 2019) (collecting cases).

When undertaking this inquiry, a court determines whether the agency provided a genuine justification for its action that is consistent with the evidence before it. *See Dep't of Commerce*, 588 U.S. at 785. In doing so, a court considers only the justifications that an agency provided when it implemented the policy; it does not consider any *post hoc* rationalizations that an agency may rely on to support its decision with the benefit of hindsight. *See Regents*, 591 U.S. at 20. And the court considers whether the policy is a reasonable response to the agency's stated goals given the facts before it and its statutory authority. *See, e.g., Dep't of Commerce*, 588 U.S. at 785; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

Where, as here, the agency changes its position, the agency must "provide a reasoned explanation for the change," "display awareness that [they are] changing position," and consider "serious reliance interests." *Encino Motorcars, LLC* v. *Navarro*, 579 U. S. 211, 221–22 (2016) (quoting *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 515 (2009)). These requirements—applicable under the Supreme Court's "change-in-position doctrine"—are to ensure that an agency does "not mislead regulated entities." *Food & Drug Admin. v. Wages and White Lion Investments, L.L.C.*, 604 U.S. ___, 2025 WL 978101 at *13 (April 2, 2025). An agency changes its position when it acts inconsistently with an earlier position, performs a reversal of its former views as to the proper course, or disavows prior inconsistent agency action as no longer appropriate. *Id., at* *14.

Here, Plaintiffs will likely prevail on their claim that Defendants' rescission of ED's prior extension approvals and determination that Plaintiffs' liquidation periods have already expired is arbitrary and capricious (Complaint Count I) under the change-in-position doctrine.

*First*, Defendants clearly and intentionally changed ED's position. *Wages and White Lion*

21

*Investments*, 2025 WL 978101 at *13. In the Rescission Letter, Secretary McMahon acknowledged that ED "previously granted a discretionary extension of the period of liquidation" to each State, advised she was "reconsider[ing]" that agency action, and declared she was "modifying the liquidation period to end on March 28, 2025," a full year earlier than provided for by ED's prior extension approvals. Rescission Letter at 1. Despite this clear change in position, Defendants did not provide a reasoned explanation for their action. The sole basis Defendants offer for rescinding the prior extension approvals is that granting additional time for Plaintiffs to access ES funding "years after the COVID pandemic ended is not consistent with the Department's priorities and thus not a worthwhile exercise of its discretion." Rescission Letter at 1. But ED previously approved Plaintiffs' extension requests *long after* the federal government had declared in May 2023 that the COVID-19 pandemic was over.[20] Defendants offer no justification for what had changed to make the end of the pandemic a "reasoned explanation" for rescinding the previously approved extension when the pandemic had already been over for more than a year at the time ED approved Plaintiffs' extension requests. Up until two weeks ago, ED consistently took the position that Plaintiffs' liquidation periods extended through March 2026.[21]

Moreover, Defendants' reliance on the end of the pandemic as justification for reversing position assumes incorrectly that all funding related to COVID-19 appropriations was intended only for use while the pandemic health emergency declaration was in place. Defendants point to no facts supporting this assumption and no reasoned analysis of the specific statutory

---

[20] *See* https://perma.cc/NL4U-N99J ("May 11, 2023, marks the end of the federal COVID-19 PHE declaration.").

[21] For example, as recently as February 12, 2025, ED expressly informed Massachusetts that its liquidation period for EANS and ESSER funds would extend through March 2026. Bell-MA ¶¶ 12, 18.

appropriations or grant programs at issue. In fact, because Congress directed that the education-related appropriations through ARP and CRRSA be utilized to address the pandemic's long-term devastating effects on students—including through summer instruction and after-school programs to compensate for lost instruction time (*see, supra*, at Background C)—it necessarily follows that Congress intended ES funding to remain available to Plaintiffs after the pandemic ended. *E.g.*, ARP §2001(e)(1); CRRSA §313; *see also, supra,* at Background A.

*Second*, Defendants failed to give any weight to Plaintiffs' and their local districts' substantial reliance interests in having a liquidation period extended through March 2026, concluding those interests are "minimal" and "unreasonable" because the extension approvals were "issued recently" and were "a matter of administrative grace" subject to reconsideration. Compl., Ex. A at 1. But Defendants' conclusion that all the extensions were "issued recently" is demonstrably false; many extensions were approved months ago.[22] And in the intervening time, Plaintiffs and their local districts have created budgets, hired staff, offered services to families and children, and developed operating plans in reliance on the fact that the liquidation period extends through March 2026.[23]

Nor does an agency's inherent power to reconsider prior determinations mean that it is inherently "unreasonable" for a regulated entity to rely on an agency "adhering to its original

---

[22] For example, ED approved New York's extension request for the ARP EANS program in September 2024. *See* Coughlin-NY ¶26; *see also* Wright-MD ¶7; Perkins-Cohen-MD ¶6; Rice-MI ¶10–13; Bell-MA ¶¶9, 15; Seaton-IL ¶¶14, 16; Stewart-DC ¶¶6-8; Rowe-PA ¶¶8, 12; Wetherell-OR ¶¶8-9, 12; Ehling-NJ ¶11; Padilla-NM ¶¶11, 13, 15; Pierson-CA ¶6; Portner-HI ¶8; Marten-DE ¶12

[23] Coughlin-NY ¶42-57; Slaga-AZ ¶¶10-15, 27; Wright-MD ¶¶9; Perkins-Cohen-MD ¶¶5, 12–15; Rice-MI ¶21; Seaton-IL ¶¶23, 25; Stewart-DC ¶¶11-12; Rowe-PA ¶24; Wetherell-OR ¶¶21-22; Ehling-NJ ¶¶18, 20; Padilla-NM ¶10; Pierson-CA ¶¶14-16; Marten-DE ¶14.

decision," as Defendants contend. Rescission Letter at 1. If that were true, then a regulated entity could never have reliance interests in any agency determination, a result that cannot be squared with the change-in-position doctrine or settled law requiring an agency to "take[] into account" the "serious reliance interests" of regulated entities when changing positions. *Regents*, 591 U.S. at 30 (internal quotation marks and citation omitted); *see also Encino Motorcars*, 579 U. S. at 221–22 (agency must consider regulated entity's "serious reliance interests"); *Fox Television Stations*, 556 U.S. at 515 (it "would be arbitrary or capricious to ignore" when a "prior policy has engendered serious reliance interests").

In addition, Plaintiffs will also likely succeed on their claim that Defendants' actions are contrary to law (Complaint Count II). Defendants' actions are based on their view that it was improper to grant Plaintiffs extensions of the liquidation period "years after the COVID pandemic ended." Rescission Letter at 1. Their view is contrary to law. Where Congress intended to limit programs or appropriations based on the end of the pandemic, it did so directly by legislation. *See, e.g.*, ARP §9401 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* §9811(hh) ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act §1109(h) ("until the date on which the national emergency . . . expires").

Moreover, after the federal government declared the pandemic health emergency over in May 2023, Congress enacted specific legislation rescinding certain coronavirus-related appropriations without referencing the ARP appropriations at issue here. *See* Fiscal Responsibility Act of 2023, Pub. Law 118-5 (June 3, 2023) (rescinding $27 billion of appropriations deemed no longer necessary once the pandemic was over). This evidences Congress' intent to retain the ES funding in place for Plaintiffs to continue utilizing to address the long-term effects of COVID-19

24

despite the end of the pandemic. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

### B.  Plaintiffs Will Suffer Irreparable Harm Absent a PI

Defendants' rescission of ED's prior extension approvals and decision to close Plaintiffs' window for accessing their ES funding effective immediately—an entire year early—has irreparably harmed, and will continue to irreparably harm, Plaintiffs. As explained above (*see, supra*, at Background C), Defendants' abrupt reversal of position on the extension approvals and determination that Plaintiffs' liquidation periods have already expired have caused—and will continue to cause—substantial operational burdens for SEAs and LEAs, leading many SEAs to lay off or furlough state employees who administer the ES funding programs and whose salaries are paid from the administrative portion of the funding, *see supra*, at n.12, with no guarantee that terminated employees will be available to be rehired at the conclusion of this case and with any new hires needing to be trained using additional state resources. *See City & County of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . . ongoing operations" for public entities, including administrative costs caused by changes in federal policy, constitute irreparable harm); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (same); *cf. Carson v. American Brands, Inc.,* 450 U.S. 79, 89 & n. 16 (1981) (recognizing that denial of job opportunities and loss of training can constitute "serious or irreparable harm.").

Even recoverable costs, "may constitute irreparable harm . . . where the loss threatens the very existence" of an organization or program. *Packard Elevator v. ICC*, 782 F. 2d 112, 115 (8th Cir. 1986); *see Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 1:25-CV-00702-JRR, ___ F. Supp. 3d ___, 2025 WL 833917, at *23 (D. Md. Mar. 17, 2025) (agency action affecting

existence of programs and livelihoods of individuals within those programs constituted irreparable harm). The immediate expiration of Plaintiffs' liquidation periods has required, and will continue to require, SEAs and LEAs to shutter key programs they have developed to counter the pandemic's long-term effects, and ultimately, the absence of these initiatives will worsen education outcomes by depriving students of critical assistance they need to overcome the pandemic's effects, including lost instruction time. *See, supra*, at Background C. While Plaintiffs and their SEAs would have had the opportunity to consider pursuing legislative proposals and budget planning that might have established some funding to allow Plaintiffs to implement some of these initiatives on their own, they had no need to do so because they relied on the previously extended liquidation period making ES funding available. By reneging on the previously approved extensions, ED irreparably harms Plaintiffs because the opportunity they would have had to consider stepping in with funds from the state fisc is an opportunity that has been irretrievably lost due to the passage of time. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017), reconsideration denied, 267 F. Supp. 3d 1201 (N.D. Cal. 2017) (uncertainty prompted by executive order withholding funds caused irreparable harm by "interfer[ing] with the Counties' ability to budget, plan for the future, and properly serve their residents" and by requiring Counties to make cuts to other services); *Mich. v. DeVos*, 481 F. Supp. 3d 984, 988–89 (N.D. Cal. 2020) (plaintiffs demonstrated likelihood of irreparable harm by detailing, "often on a district and school-level basis, the financial and operational harms" caused by requiring state agencies to divert millions of dollars in federal funding from programs earmarked to support public schools to other programs); *Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001) (threats to State's public policy and sovereign interests constitute irreparable harm).

Absent relief from this Court, Plaintiffs—including their education departments, local

school districts, and the communities they serve—have suffered, and will continue to suffer, immediate and irreparable harm through the irredeemable loss of programs and services necessary to address the pandemic's long-term effects, and the need to lay off staff that run those programs and services whose salaries are paid through the ES funding grants.

### C. The Public Interest and Balance of Equities Strongly Favor Granting a PI

To obtain preliminary relief, plaintiffs must also show that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20. When the federal government is a party, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As an initial matter, Plaintiffs have established both an overwhelming likelihood of prevailing on the merits and irreparable harm. This "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Saget*, 375 F. Supp. 3d at 377 ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief." (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

Moreover, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Conversely, courts routinely observe that "there is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (internal quotation marks, citations, and alterations omitted) (collecting cases). As Plaintiffs have shown, Defendants' rescission of the prior extension approvals and determination that Plaintiffs' liquidation periods have already expired violate the APA. *See, supra*, Point II.A. There is, therefore, a strong public interest in preliminarily enjoining Defendants from

continuing to implement and enforce the Rescission Letter. Put simply, the public has a strong interest in the federal government playing by the rules. *See*, *e.g.*, *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) ("[I]t is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy or law.").

By contrast, the federal government does not suffer harm from an injunction that preserves the *status quo* pending litigation by pausing implementation of an unlawful practice. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). There is no public interest served by allowing ED to implement its abrupt and unlawful change position during this litigation.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court enter the accompanying Proposed Preliminary Injunction Order to enjoin Defendants from enforcing the directives in the Rescission Letter against Plaintiffs, along with granting such other relief as the Court deems necessary and appropriate to maintain the *status quo* pending resolution of this action.

Dated: New York, New York
       April 11, 2025

Respectfully submitted,

LETITIA JAMES
ATTORNEY GENERAL OF NEW YORK

By: */s Andrew Amer*
Andrew Amer
  *Special Counsel*
Molly Thomas-Jensen
  *Special Counsel*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Stephen C. Thompson
  *Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6127
andrew.amer@ag.ny.gov

*Counsel for the State of New York*

ROB BONTA
ATTORNEY GENERAL OF CALIFORNIA

By*:    /s/ Maureen C. Onyeagbako*
Maureen C. Onyeagbako*
  *Supervising Deputy Attorney General*
José Pablo Galán de la Cruz*
  *Deputy Attorney General*
Cheryl L. Feiner*
  *Senior Assistant Attorney General*
California Attorney General's Office
1300 I Street, Ste. 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone:  (916) 210-7324
Email:  Maureen.Onyeagbako@doj.ca.gov
      Pablo.Galan@doj.ca.gov
      Cheryl.Feiner@doj.ca.gov

*Counsel for Plaintiff State of California*

KRISTIN K. MAYES
ATTORNEY GENERAL OF ARIZONA

By: /s/ *Alexa Salas*
Alexa Salas*
  *Assistant Attorney General*
Lauren Watford*
  *Assistant Attorney General*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Alexa.Salas@azag.gov
Lauren.Watford@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

KATHLEEN JENNINGS
ATTORNEY GENERAL OF THE STATE OF DELAWARE

By: /s/ *Vanessa L. Kassab*
Ian Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

BRIAN L. SCHWALB
ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

By: /s/ Andrew Mendrala
Andrew Mendrala*
  Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW Washington, DC
20001
(202) 724-9726
Andrew.Mendrala@dc.gov

Counsel for the District of Columbia


AARON M. FREY
ATTORNEY GENERAL FOR THE STATE OF
MAINE

By:/s/ Sarah A. Forster
Sarah A. Forster*
  Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Sarah.Forster@maine.gov

Counsel for the State of Maine

ANNE E. LOPEZ
ATTORNEY GENERAL FOR THE STATE OF
HAWAI'I

By: /s/ Kaliko'onālani D. Fernandes
David D. Day*
  Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
  Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

Counsel for the State of Hawai'i


KWAME RAOUL
ATTORNEY GENERAL FOR THE STATE OF
ILLINOIS

By: /s/ Elena S. Meth
Cara Hendrickson*
  Assistant Chief Deputy Attorney General
Elena S. Meth*
  Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 835-0182
Cara.Hendrickson@ilag.gov
Elena.Meth@ilag.gov

Counsel for the State of Illinois

ANTHONY G. BROWN
ATTORNEY GENERAL FOR THE STATE OF
MARYLAND

By: /s/ Keith M. Jamieson
Elliott Schoen*
  *Principal Counsel*
  *Assistant Attorney General*
Alan J. Dunklow*
  *Deputy Principal Counsel*
  *Assistant Attorney General*
Maryland State Department of Education
Keith M. Jamieson*
  *Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us

*Counsel for the State of Maryland*

DANA NESSEL
ATTORNEY GENERAL OF MICHIGAN

By: /s/ Neil Giovanatti
Neil Giovanatti
BreAnna Listermann*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

*Counsel for the People of the State of
Michigan*

ANDREA JOY CAMPBELL
ATTORNEY GENERAL OF MASSACHUSETTS

By: /s/ David C. Kravitz
David C. Kravitz*
  *State Solicitor*
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2427
david.kravitz@mass.gov

*Counsel for the
  Commonwealth of Massachusetts*

KEITH ELLISON
ATTORNEY GENERAL FOR THE STATE OF
MINNESOTA
By: /s/ Liz Kramer
Liz Kramer*
  *Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

AARON D. FORD
ATTORNEY GENERAL OF NEVADA

By: /s/ Heidi Parry Stern
Heidi Parry Stern (Bar. No. 8873)
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

31

MATTHEW J. PLATKIN
  ATTORNEY GENERAL OF NEW JERSEY

*/s/ Lauren E. Van Driese*
Lauren E. Van Driesen
Jessica L. Palmer
Justine Longa*
  *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Lauren.VanDriesen@law.njoag.gov
Jessica.Palmer@law.njoag.gov
Justine.Longa@law.njoag.gov

*Counsel for the State of New Jersey*


DAN RAYFIELD
ATTORNEY GENERAL FOR THE STATE OF
OREGON

By:   */s/ Sara Van Loh*
Sara Van Loh OSB #044398*
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, Oregon 97201
Tel (971) 673-1880
Fax (971) 673-5000
Sara.VanLoh@doj.oregon.gov

*Attorneys for the State of Oregon*


RAÚL TORREZ
ATTORNEY GENERAL OF THE STATE OF NEW
MEXICO

*/s/ Anjana Samant*
Anjana Samant*
  *Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
asamant@nmdoj.gov
(505) 270-4332

*Counsel for the State of New Mexico*


JENNIFER C. SELBER
  *General Counsel*
Michael J. Fischer
  *Executive Deputy General Counsel*

By:*/s/ Thomas P. Howell*
Thomas P. Howell*
  *Deputy General Counsel*
Governor's Office of General Counsel
30 N. 3rd Street, Suite 200
Harrisburg, PA 17101
(717) 460-6786
thowell@pa.gov

*Counsel for Governor Josh Shapiro,
Commonwealth of Pennsylvania*


* Pro Hac Vice application to be filed

**CERTIFICATION**

I certify that, excluding the caption, table of contents, table of authorities, signature

block, and this certification, the foregoing Memorandum of Law contains 8683 words, calculated

using Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the United States

District Courts for the Southern and Eastern Districts of New York.

Dated: New York, New York
      April 11, 2025

                        LETITIA JAMES
                        Attorney General of the State of New York

                        By: /s Andrew Amer
                        Andrew Amer
                          Special Counsel
                        28 Liberty Street
                        New York, NY 10005
                        (212) 416-6127
                        andrew.amer@ag.ny.gov