# EXHIBIT B

P561NYSA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   STATE OF NEW YORK, et al.,

 4                  Plaintiffs,

 5          v.                            25 Civ. 2990 (ER)

 6   UNITED STATES DEPARTMENT OF
     EDUCATION, et al.,
 7
                    Defendants.           Oral Argument
 8   ------------------------------x
                                          New York, N.Y.
 9                                        May 6, 2025
                                          10:00 a.m.
10
     Before:
11
                          HON. EDGARDO RAMOS,
12
                                          District Judge
13
                            APPEARANCES
14
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
15        Attorneys for Plaintiffs
     BY:  ANDREW S. AMER, ESQ.
16        STEPHEN C. THOMPSON, ESQ.
          Assistant Attorneys General
17
     UNITED STATES ATTORNEY'S OFFICE SOUTHERN DISTRICT OF NEW YORK
18        Attorneys for Defendants
     BY:  CHRISTOPHER K. CONNOLLY, ESQ.
19        DANA W. KUMAR, ESQ.
          Assistant United States Attorneys
20

21

22

23

24

25
```

P561NYSA

```
1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your names

3   for the record.

4              MR. AMER:  Good morning, your Honor.  Andrew Amer with

5   the New York Attorney General's Office.  I'll be presenting the

6   argument for the plaintiffs today.

7              THE COURT:  Good morning.

8              MR. AMER:  Good morning.

9              MR. THOMPSON:  Good morning, your Honor.  Stephen

10  Thompson, also from the New York State Office of the Attorney

11  General.

12             MR. CONNOLLY:  Good morning, your Honor.  Christopher

13  Connolly from the US Attorney's Office on behalf of defendants.

14             MR. KUMAR:  Good morning, your Honor.  Dana Kumar,

15  also from the U.S. Attorney's Office of the Southern District

16  of New York, on behalf of the defendants.

17             THE COURT:  Good morning to you all.  This matter is

18  on for a hearing on the request for a preliminary injunction

19  brought on behalf of the State of New York, 15 other states,

20  and the District of Columbia.

21             Mr. Amer, I'll hear you.

22             MR. AMER:  Thank you, your Honor.

23             Again, for the record, Andrew Amer with the New York

24  Attorney General's Office.

25             On March 28th of this year, your Honor, the Department
```

1    of Education and Secretary McMahon pulled the rug out from

2    under the plaintiff-states when they cut short by a full year

3    the period for the states to draw down on nearly $1 billion of

4    education-stabilization funding that Congress had appropriated

5    and that the Education Department had already awarded to them.

6    And without even a minute's advance notice, the defendants

7    declared that the states' window to liquidate those funds had

8    already expired, a full year before the extensions had

9    permitted them to draw down on those funds.

10           The Department's actions have upended ongoing programs

11   and projects intended to address the devastating impact of

12   COVID-19 on K-12 students and teachers.  Our motion asks the

13   Court to preliminarily enjoin this agency action in order to

14   maintain status quo pending resolution of this case.

15           I'd like to first address irreparable harm if that's

16   okay with the Court, but I did want to just briefly review how

17   we got to where we are.

18           THE COURT:  Very well.

19           MR. AMER:  A few years ago, your Honor, the states

20   submitted detailed grant applications for funding under COVID

21   appropriation laws, which the Department approved, confirming

22   that the projects were eligible under the appropriating

23   legislation.  The Department awarded billions of dollars in

24   funding under this appropriation statute.  For example, just to

25   name two of the appropriations, the two that received the

P561NYSA

1    largest amounts, California received an appropriation of——an

2    award of $15 billion, New York received an award of $9 billion.

3    The states then submitted extension requests, providing

4    detailed explanations for why they needed more time to draw

5    down on these funds.  As an example of these extension

6    requests, the Court can look at Exhibit 4 to the New York

7    declaration, which is Docket No. 26.  It's quite detailed.

8         The Department granted the states' extension requests

9    based on specifically finding that the states had provided

10    sufficient justification and documentation and extended the

11    liquidation period for an additional 14 months, through March

12    of 2026.  Now the state education agencies relied on both the

13    initial grant awards and the extension approvals through March

14    of 2026 in planning their budgets, in developing and launching

15    programs and projects using the funding, and in entering into

16    contracts with vendors.  Programs and projects were ongoing

17    when the extension approvals were rescinded on March 28th.

18         THE COURT:  Can I ask just a couple of questions on

19    that.

20         MR. AMER:  Certainly.

21         THE COURT:  First of all, I don't believe that this is

22    an issue in this case, but were there any restrictions on how

23    the funds could be used by the local and state school

24    authorities?

25         MR. AMER:  There were, your Honor, because the monies

P561NYSA

1    were appropriated for specific types of programs and projects,

2    and in seeking the grants in the original applications, the

3    state education agencies had to describe the projects and

4    programs that were going to be funded by this money.  And so

5    when the state education agencies seek reimbursement for funds

6    during their window, they need to show that the projects are

7    the same ones for which the funds were granted.  In other

8    words, it has to match; the reimbursement request has to match

9    up with what the grants were awarded for in the first instance.

10           THE COURT:  So you have to provide receipts, as it

11    were.

12           MR. AMER:  Yes.  Effectively, yes.

13           THE COURT:  And then some of these projects were for

14    infrastructure projects, correct?

15           MR. AMER:  That's correct.  In the appropriating

16    legislation, there was money that was made available for

17    improving facilities——for example, ventilation.  It was all

18    intended to address the need to prevent the spread of virus,

19    not only for COVID-19 but in the future, for whatever other

20    viruses might happen in the future.

21           THE COURT:  And as I understand it, the monies for

22    which you received an extension, I guess you received an

23    extension to draw those monies down, correct?

24           MR. AMER:  Correct.  The initial 120-day period in the

25    statute ran the end of January of 2025, I believe, and Congress

P561NYSA

allowed extensions for another 14 months, and when those

extension requests were made, they were quite detailed.  Like I

said, if you look at Exhibit 4 to the New York declaration,

you'll see it's very detailed.  And there was a specific

finding by the Education Department when granting those

extension requests that sufficient justification and

documentation had been provided.

THE COURT:  And the monies that we're talking about

for which you requested an extension to liquidate, were those,

in what I understand government parlance to be, appropriated

funds?

MR. AMER:  They were not only appropriated funds, they

were funds that had already been awarded in the grant award

notifications, so they were monies that the states understood

they were already entitled to under the grants.  They just

hadn't tapped them yet, they hadn't liquidated them yet,

because their projects were ongoing and this is a

reimbursement-type process.

THE COURT:  And again, it doesn't appear to be part of

the dispute here, but to your knowledge, did the federal

government refuse to reimburse any projects that were submitted

by the various states?

MR. AMER:  I'm not aware that that happened, and I

would say, your Honor, in fact, prior to February of 2025, the

reimbursement process was automated, and there is evidence in

P561NYSA

1    the record that under that procedure, the states typically

2    received reimbursement the next business day following the

3    request.  So this was a very cursory ministerial review of

4    payment requests that just checked to make sure that the

5    receipts——if we'll call them that——matched up with what the

6    awards were originally approved for.

7             THE COURT:  Okay.  So there was no controversy or

8    dispute concerning the nature of the projects that the various

9    school authorities engaged in and sought reimbursement for; is

10   that right?

11            MR. AMER:  That's correct.  I mean, to the extent that

12   states were seeking monies for projects that were not eligible,

13   they wouldn't have been given those funds in the grant award.

14            THE COURT:  Okay.

15            MR. AMER:  So in addressing irreparable harm, I wanted

16   to approach this by describing the four buckets of irreparable

17   harm as we see it, established by the declarations in the

18   record.

19            First, a portion of the grants go directly to the

20   state education agencies to cover the cost of administering the

21   grant programs.  We're talking about, again, billions of

22   dollars.  It takes a fair amount of overhead to administer the

23   programs for the local education agencies and the nonpublic

24   schools that are eligible for this funding.  And most notably,

25   this goes to pay staff to administer these programs.  Each

P561NYSA

1    state's administrative apparatus is being adversely impacted by

2    the agency action, and in fact some administrative arrangements

3    are already being dismantled by the states, as evidenced by the

4    declarations, because the funding is now gone as a result of

5    the Department's actions, and that includes laying off staff

6    and furloughing staff.

7              THE COURT:  And has that already happened?

8              MR. AMER:  It has.  And I would refer the Court to the

9    Illinois declaration at paragraph 25——that's Docket No. 18——the

10   New York declaration at 55-57, paragraphs 55-57, and that's

11   Docket No. 26.  It's happened already, and it's continuing to

12   happen.

13             Second, programs and services to compensate for lost

14   instruction time to students are being halted with no ability

15   of the states to pick up the tab to keep these programs

16   running.  This has real adverse consequences for students and

17   their ability to catch up for all the lost time due to the

18   pandemic.  It's important, your Honor, to understand that due

19   to budget timing, the states are simply not in a position to

20   consider now whether and how the states and their legislatures

21   might be able to appropriate funds to continue these programs

22   because the states never needed to pursue that option, given

23   that the federal government stepped up to the plate and,

24   through the American Rescue Plan, made these funds available.

25   So this is a lost opportunity for the states that translates

P561NYSA

1    into irreparable harm.  And unfortunately, it's just too late

2    for the states to step in and consider being able to continue

3    these vitally important programs for students.

4              Third, vendors, local education agencies, and

5    nonpublic schools have already incurred expenses that they were

6    expecting would be reimbursed from the grant monies, but they

7    are now left holding the bag because the funding is no longer

8    available.  Now this exposes the states to potential lawsuits,

9    which of course have attendant defense costs.  And that's in

10   the record, the New York declaration, paragraph 61.  Again,

11   it's Docket No. 26.

12             THE COURT:  What is a nonpublic school?

13             MR. AMER:  Nonpublic schools are religious schools and

14   private schools.

15             THE COURT:  Okay.  And the various acts don't make any

16   distinctions between those entities.

17             MR. AMER:  Actually, there are three different

18   programs that are involved here.  It will test my memory of the

19   acronyms, but there are the ESSER funds, which is public

20   schools; there's the Homeless Children and Youth; and then

21   there's the EANS program, and that is for the nonpublic

22   schools, the final one.

23             Fourth, your Honor, the vendors are refusing to

24   perform services under existing contracts.  This includes

25   contractors who are just walking off construction projects,

P561NYSA

leaving schools with areas that are unusable and unsafe.  In
fact, the New York declaration at paragraphs 47-49 attests to
the fact that there are some facilities that now have gaping
holes in the walls and the ceiling because ventilation upgrade
projects have been halted since the contractors have walked off
the site in light of the March 28th letter rescinding the
extension approvals.  This clearly adversely affects the
states' ability to provide for the basic educational needs of
their students.

        Now the defendants have basically one response to all
of this harm.  Their response is that in fact there is no
irreparable harm here because the states can seek
project-specific extension requests.  So let me be clear.  It's
our position that there simply is no equivalence between the
right that the states had to submit timely payment requests
prior to 5 p.m. on March 28th, which were subject to this
cursory ministerial review, and their ability now under this
new process to ask for project-specific extensions.  Before the
rescission letter, state education agencies had to submit a
fairly——had to submit these payment requests, and as I
mentioned, they were subject to pretty ministerial, minimal
review, and in fact, states were receiving payment within the
next business day when it was done on an automated process.
Post-rescission letter, this new process that the defendants
contend is just as good clearly is not.  The states are

P561NYSA

stripped of their ability to submit payment requests that are

viewed as timely, and instead they now must submit extension

requests all over again.  They're starting from square one.

And they have to do so on a project-specific basis, which was

never the case in terms of how they had to request the prior

extensions.  Each project must be——each project-specific

request must be supported by detailed information, as listed in

the Department's April 3rd letter, and it has to include a

justification as to why the Department should grant the

extension.

THE COURT:  But hadn't that already been done?  In

order to qualify for payment in the first instance, didn't you

have to submit information concerning the projects that you

wanted to undertake and why they were within the purview of the

funding statutes?  Wasn't that already done?

MR. AMER:  Absolutely, your Honor.  In fact, what was

done prior, if you include the original application for the

grant, was even more extensive.  But yes, all of that.  It

simply ignores the history here of the Department having

already approved the grants initially and then approving the

prior extension requests, and those extension requests were

granted based on specific findings by the Department that each

state had provided a sufficient justification and

documentation.

THE COURT:  Can you give me an idea of how many

P561NYSA

1   different projects, say, California and New York were running

2   that were subject to these programs?

3          MR. AMER:  We have in the record spreadsheets, and I

4   can get the number for you, but if you look at Exhibit 4 to the

5   New York declaration, you'll see all of the projects that are

6   the subject of the extension requests.  It's dozens for both of

7   those states, because they're large states, obviously.  And the

8   amount of money that was remaining for this funding as of

9   March 28th is tens of millions for some states and more than a

10  hundred million for other states.  So New York, for example,

11  was about 134 million, I think.  A number of states had eight-

12  and nine-figure sums left on their funding to draw down on.  So

13  still a significant amount of money we're talking about here,

14  your Honor, as of the date of the rescission letter.

15         THE COURT:  And was it the intent of the various

16  agencies to ultimately draw down all of those funds or were

17  there going to be some left over?

18         MR. AMER:  I believe it was the intent to use all the

19  funds, but, you know, it's possible that come March of 2026,

20  they might not have tapped all of the funding, but I think it

21  was certainly the intent to do so.

22         The new process also runs contrary to the urging of

23  the Senate Committee on Appropriations.  That committee had

24  urged the Department to adopt a procedure for extension

25  requests that would impose minimal burden on the states, and in

1   fact, that was the case for the prior extension request round,

2   if you will.  There's simply no indication in the record, your

3   Honor, of how long this new process—which is a six-step

4   process of review, including two different levels of management

5   within the Department that's outlined in the April 3

6   letter—simply no indication in the record of how long that

7   review would take, nor do we know how likely it is that any

8   project-specific extension will be approved.

9           In short, your Honor, the new process gives the states

10  no assurance or comfort that they will be able to liquidate

11  anywhere close to the funding that was awarded and that

12  remained unliquidated, and they will have no clarity on that

13  issue any time soon, given this six-step process that the

14  Department purports they will undertake.

15          I would also mention, your Honor, that both the

16  administration and Secretary McMahon have mentioned any number

17  of times in public that the ultimate goal here is to completely

18  dismantle the Department of Education.  That's something the

19  Court can take judicial notice of.  It's been reported in the

20  press widely.  And they make no—they don't dispute that that's

21  the ultimate goal.  That does not bode well, your Honor, for

22  the prospect of this new process and its review happening in a

23  prompt and timely manner.  We submit, your Honor, that what is

24  really going on here is that the Department is trying to just

25  wipe the slate clean and get a do-over, not just on the prior

P561NYSA

1    decision to grant the extensions but also to award the grants

2    in the first instance.  That is clear from the Department's

3    April 3 letter, which requires states seeking project-specific

4    extension under this new process to explain how a particular

5    project is necessary to mitigate the effects of COVID rather

6    than just focusing on why they need more time.

7         I did want to mention, by the way, just to circle

8    back, New York had approximately 85 projects underway for those

9    three funding programs that I mentioned.

10        I want to move next to the likelihood of success

11   prong, your Honor, and address first the threshold question

12   that defendants have raised of whether this is a final agency

13   action subject to review under the APA.  This case focuses on

14   the Department's two determinations conveyed in the March 28th

15   letter—the first being the rescission of the prior approvals,

16   and the second, the determination to declare that the

17   liquidation periods already expired as of 5 p.m. on March 28th.

18   We submit there is absolutely nothing tentative about those

19   determinations.  They are not subject to any further agency

20   action.  And those two determinations have immediate legal

21   consequences for the states.  The states no longer have the

22   right to submit timely payment requests to liquidate their

23   grant funds that would be subject to a cursory ministerial

24   review.  Now the defendants conflate these two determinations

25   with some future decision that the Department may reach about

P561NYSA

whether to grant extensions on a project-specific basis, but that's an entirely different agency action and it's simply not relevant to the question of whether the two determinations encompassed in the March 28th letter are now final.  But I would add, your Honor, that even if the Court considers this new process of seeking project-specific extensions to be some sort of reconsideration of the March 28th determinations, the APA expressly forecloses their argument that it's not final under Section 704 because that section says that even if there's reconsideration, it doesn't make agency action nonfinal unless the agency action is inoperable pending the outcome of the reconsideration.  And here, they say it's effective immediately, not that it's inoperable.

So for those reasons, your Honor——

THE COURT:  In other words, if the Department of Education were to say, we are rescinding the grants that were made in two weeks, for example——

MR. AMER:  I think it would have to be more than that. I think, under Section 704, they would have to say, we are going to rescind subject to this process of a project-specific extension, and our rescission remains inoperable pending our consideration and decision on any project-specific extension you want to make.

THE COURT:  So status quo continues, and you can submit the requests for reimbursement in the meantime.

P561NYSA

1              MR. AMER:  Exactly right, your Honor, and it makes

2    sense that Section 704 says that because it by design means

3    that there's no impact of the agency action until this

4    reconsideration process plays out and there's a definitive

5    determination.

6              Another threshold issue that defendants have raised is

7    prudential ripeness.  For the same reason that the agency

8    action is final, we believe that it's also fit for review by

9    this Court because there's nothing more that the agency need do

10   in terms of its consideration, and absent the Court's review,

11   the states will endure the hardship of the irreparable harm

12   that I've already discussed.  And so those are the two prongs

13   of the prudential ripeness test that are clearly met here.

14              I wanted to turn next to the substantive claims under

15   our likelihood of success prong and just talk about the two APA

16   claims, the first being arbitrary and capricious.  Your Honor,

17   this is a classic case of an agency changing position without

18   complying with the change in position doctrine that requires a

19   reasoned explanation and accounting for the significant

20   reliance interest of the plaintiff.  And I should mention that

21   the Supreme Court has very recently discussed this change in

22   position doctrine in the *FDA v. Wages & White Lion Invs.* case

23   that was decided April 2nd of this year; that's at 2025 WL

24   978101.  The March 28th letter provides the only explanation

25   from the Department for its about-face on the extension

P561NYSA

approvals, and their explanation boils down to saying that
because the pandemic is over, there's no extra time warranted
for the states to have in order to liquidate hundreds of
millions of dollars that remain in funding.  This makes no
sense, for two reasons, your Honor.

First, the end of the pandemic is not a new
development.  The federal government declared the pandemic to
be over in May of 2023.  That's when the health emergency was
declared at an end.  That is long before the Department granted
the extensions that it is now rescinding, and some of those
extensions were granted as recently as January and February of
this year, so 2025.  So there's nothing new here that would
justify and provide a reasoned explanation in terms of the
timing of the health emergency being over.

Second, the state education agencies, as the Court has
already noted, previously provided, and the Department already
accepted as warranted, the explanations given by the states in
support of the prior extension requests for why more time was
needed to put these funds to use.  And I'll just give you two
examples.

The states previously explained that they needed more
time to implement and continue programs like after-school
classes and summer school and extended school year programs to
make up for lost instruction time.  The fact that the pandemic
ended in 2023 didn't obviate the need for this critical

P561NYSA

1    intervention to help the students catch up from the pandemic

2    and the lost instruction time.

3         Another example is that the states already explained

4    that supply chain disruptions due to the pandemic require them

5    to take additional time to complete construction projects, like

6    HVAC upgrades.

7         So those explanations have already been provided and

8    have already been accepted.

9         The defendants ignore the states' reliance on the

10   extensions, the second part of the change in position test.

11   It's clear from the declarations that state education

12   authorities——agencies and local education agencies factored

13   into their budgets program planning and contracting with

14   vendors their ability to continue to liquidate the grant funds

15   through March of 2026, each of these entities incurring costs

16   they expected would be reimbursed through timely payment

17   requests, subject, again, to a cursory ministerial review by

18   the Department.  So in the absence of a reasoned explanation

19   and no accounting for the substantial reliance interests, it's

20   clear that this action by the defendants violates the change in

21   position doctrine.

22        The second substantive claim under the APA is contrary

23   to law.  I'll just briefly mention the two points there that we

24   think indicate the states are highly likely to succeed on that

25   claim.

```
1            First, Congress clearly intended the funds to remain
2    available after the end of the health emergency.  Congress
3    specifically did not tie the funds to the continuing existence
4    of the health emergency, as it did with other COVID funding.
5    And we cite to a number of statutes on page 24 of our opening
6    brief that illustrate Congress tying the funds to the health
7    emergency.  So Congress knew how to do it, and didn't do it
8    here with respect to the American Rescue Plan funds at issue.
9            THE COURT:  As I understand it, you say in your papers
10   at various points that Congress encouraged the Department of
11   Education to be flexible and to allow these extensions; is that
12   right?
13           MR. AMER:  Yes, that's the Senate Committee on
14   Appropriations Report that urged the Department to be liberal
15   with granting extensions and to require minimal burden in terms
16   of documentation.  And that's exactly what happened in terms of
17   the prior round of extensions.
18           But more to the point, Congress, in enacting the
19   legislation that appropriated these funds, didn't specifically
20   tie the availability of the funds to the continuing existence
21   of the pandemic, like they did in these other statutes that we
22   cite to on page 24 of our opening brief.  And additionally,
23   Congress did not claw back the funds once the pandemic was
24   declared over, which is something else that Congress did in
25   other instances.  For example, we note in the Fiscal
```

P561NYSA

1    Responsibility Act of 2023, Congress pulled back funding that

2    had not been tapped.  So by specifying in the American Rescue

3    Plan statute that the funds are to address long-term effects of

4    the pandemic, and by not tying the funds to the end of the

5    health emergency, and by not clawing the money back as it did

6    in other instances, it's clear we think that Congress obviously

7    intended the funds to remain available after the government

8    declared the health emergency to be over, which shows that the

9    Department's actions here rescinding the funding and declaring

10   the window to be already closed is contrary to law.

11        The final two factors of the preliminary injunction

12   test, your Honor, are public interest and balance of the

13   equities, and I'll just briefly go over those.  As your Honor

14   is aware, those two factors merge here, because the government

15   is a party.  We submit that because of the strong showing that

16   the states have made on irreparable harm and likelihood of

17   success, that's sufficient to establish that an injunction

18   would in fact be in the public interest.  We think, moreover,

19   there is a strong public interest in preventing the Department

20   from violating the APA by abruptly rescinding the prior

21   extension approvals, which afforded the states, until March of

22   2026——so another additional year——to draw down on this critical

23   funding intended to combat the devastating long-term effects of

24   the pandemic on students and educators.  And finally,

25   defendants, for their part, we submit, have not articulated any

P561NYSA

1   harm that they will suffer in maintaining the status quo here,

2   which, by the way, would simply require the Department to honor

3   the extension approvals it had previously determined were

4   justified based on the showing that each state has already made

5   when requesting the extensions in the first place.

6          THE COURT:  If I were to grant the preliminary

7   injunction, would I have to find likelihood of success both on

8   arbitrary and capriciousness and contrariness to law?

9          MR. AMER:  No, you don't, your Honor.  Just any one of

10  the claims would support entry of a preliminary injunction

11  under the four-part test.  So as long as the Court was

12  satisfied that at least one of the claims had a likelihood of

13  success, that would satisfy that prong.

14         In conclusion, your Honor, the states ask the Court to

15  preliminarily enjoin the defendants from implementing and

16  enforcing the March 28th rescission letter as against the

17  plaintiff-states, so that their education agencies can

18  continue, during the course of this case, to submit timely

19  payment requests to liquidate their funding just as they had

20  been doing prior to March 28th.  And as the Court will see in

21  our proposed preliminary injunction order, we also ask that the

22  Court require the defendants to provide two weeks' notice to

23  both the Court and to the plaintiffs if they intend to modify

24  the states' liquidation periods on any other grounds other than

25  those that are set forth in the rescission letter.

P561NYSA

1          THE COURT:  The Department of Education has already

2     rescinded the grant so you cannot today submit a reimbursement

3     request in the manner that you could prior to March 28.  You're

4     asking me to enter a preliminary injunction that allows you to

5     do that.  Why, therefore, isn't that a mandatory injunction as

6     opposed to a prohibitory injunction?

7          MR. AMER:  So we think it is a prohibitory injunction.

8     It's simply asking the Court to maintain the status quo as it

9     existed before the rescission letter was issued.  I think the

10    defendants' position is that it's a mandatory injunction and

11    that it requires a heightened showing.  We absolutely disagree

12    with that.  This is a classic example of a prohibitory

13    injunction.  It merely seeks to turn the clock back to

14    5:02 p.m. Eastern time March 28th and have the parties proceed

15    just as they had been proceeding the minute before the

16    challenged action took effect.

17          THE COURT:  Thank you.

18          MR. AMER:  Thank you, your Honor.

19          THE COURT:  Mr. Connolly?

20          MR. CONNOLLY:  Thank you, your Honor.  Good morning

21    again.  Christopher Connolly from the U.S. Attorney's Office on

22    behalf of the defendants.

23          At the same time that the Department of Education

24    rescinded its prior extension of the liquidation deadline, it

25    invited states to seek project-specific extensions of the

1    liquidation period.  It provided further information about that

2    process just a few days later in its April 3rd letter.  The

3    grant money at issue here is still available to states.  To

4    date, the Department has received over 200 applications from

5    around 30 states, including at least one of the

6    plaintiff-states here.  The Department has already approved

7    extensions of the liquidation periods for certain projects.

8    And where it's declined to approve extensions, states are able

9    to appeal that declination administratively.

10          THE COURT:  But the prior program ended, right?  It

11   was rescinded by virtue of the secretary's determination.

12          MR. CONNOLLY:  The prior program didn't end.  The

13   prior extension deadlines that had been extended until March

14   2026 were ended with the provision that states could then seek

15   project-specific extensions, which many of them have done and

16   some of them have already received.

17          THE COURT:  And will they receive approval of those

18   requests if they were to submit an application?  Is there a

19   guarantee that they will receive approval for those programs if

20   they were to submit an application in accordance with the

21   secretary's letter?

22          MR. CONNOLLY:  So what happens is, states seek an

23   extension, a project-specific extension; they describe the

24   project that they're seeking the extension for; the Department

25   reviews that; and where the Department grants that extension of

P561NYSA

1    the liquidation deadline, then the state proceeds with the

2    project that it had described, and then will come back to seek

3    reimbursement for the funds expended as part of that project,

4    and will presumably have to demonstrate through the receipts

5    and stuff that, you know, the work that they did was related to

6    the project that they'd sought the extension for; and then they

7    would receive the funds.

8         THE COURT:  So the answer to my question is no,

9    there's no guarantee; that if they were to make application

10   anew with respect to projects that had previously been

11   approved, there's a possibility that they will not receive

12   reimbursements for those monies expended.

13        MR. CONNOLLY:  As I understand it, that would only be

14   in the situation where the work that they undertook was not

15   related to the project that they had explained.  The

16   expectation is that when you get this extension of the

17   liquidation period, a project-specific extension, the states

18   have described the specific project that they're going to be

19   undertaking, that they will then be able to draw down those

20   funds after they've engaged in the project.  So I think the

21   answer to your Honor would be yes.

22        THE COURT:  So then there was no rescission?

23        MR. CONNOLLY:  There was a rescission of the March 28,

24   2026, extension, yes, subject to the ability of states to seek

25   project-specific extensions, which many of them are in the

P561NYSA

1    process of doing, and which the Department is in the process of

2    reviewing.

3            THE COURT:  But if these projects were already

4    preapproved or approved prior to the rescission of March 28th,

5    why would they have to reapply?

6            MR. CONNOLLY:  Your Honor, as I understand it, when

7    the states initially sought these funds, they would describe,

8    perhaps in more general terms, the types of projects that they

9    were intending to undertake in connection with these

10   appropriations.  What the Department is asking states to do

11   here is, to the extent that they require additional time to

12   draw down some of those funds, to identify and describe the

13   specific projects that remain at issue.  And then the

14   Department is considering those on a project-specific basis,

15   and where it determines it's appropriate, it is extending those

16   liquidation periods for those projects.

17           THE COURT:  So again, I believe I asked Mr. Amer

18   whether the states had undergone that process in the first

19   instance, and I believe his answer was that yes, that the

20   states did, in accordance with the contours of the funding

21   programs, submit proposed projects, which were approved, and

22   for which they simply had to submit the receipts, as I put it,

23   in order to be reimbursed for the completion of those projects.

24   So what you are saying, I think, is that, well, you have to do

25   that again, right?

1          MR. CONNOLLY:  You have to do that again, and as

2     I——obviously at this point we have the complaint, we have the

3     allegations, and I think broadly, the government agrees with

4     what Mr. Amer is describing, but I think the distinction is

5     that those initial applications would not necessarily have gone

6     into the level of detail about specific projects that the

7     Department is now asking for in connection with these

8     project-specific extensions.  In some instances perhaps states

9     described those projects specifically; in other instances it

10    was perhaps more of a broader indication of the type of work

11    that they were intending to use the funds for.  And now, to

12    seek to get further extensions of that liquidation period, the

13    Department is simply asking the states to describe with

14    specificity the projects for which they require additional

15    extensions.

16         THE COURT:  Again, as I understand it——and to your

17    point, we only have the complaint, we have several

18    declarations——not only did they have to initially submit

19    projects for approval, but when they wanted to extend the time

20    to be reimbursed, they had to provide additional details as to

21    why that was necessary, correct?

22         MR. CONNOLLY:  The states made applications for

23    extensions before, yes; not on a project-specific basis, but

24    they provided some explanation for why they were requesting an

25    extension of that liquidation period.

P561NYSA

 1          THE COURT:  And as I read the complaint, in every

 2    instance at least that's cited in the complaint, the response

 3    that they received for approval of an extension was after

 4    careful review or after careful consideration.  Do you have any

 5    reason to believe that that did not take place—that is to say,

 6    careful review or careful consideration?

 7          MR. CONNOLLY:  I have no reason to believe that that

 8    did not take place for the extensions that were described in

 9    the complaint.  Again, I mean, taking the allegations in the

10    complaint as true at this point.

11          THE COURT:  Okay.

12          MR. CONNOLLY:  So because these grant funds are still

13    available to the states and because states can continue to seek

14    and have sought and are obtaining these project-specific

15    extensions, a preliminary injunction is not appropriate at this

16    time.

17          I can briefly walk through each stage of the

18    preliminary injunction analysis, beginning with likelihood of

19    success.  And in particular, there is no final agency action

20    here.  Courts have emphasized that the finality inquiry is

21    flexible and pragmatic, and here, the rescission of the

22    extensions on March 28th was coupled, both in the March 28

23    letter and in the April 3rd letter, with the invitation to

24    states to seek project-specific extensions.  And so contrary to

25    some of what the states suggest, this is not foreclosing the

P561NYSA

```
 1    opportunity for states to access these funds and to draw down

 2    these funds for the projects that they intended to use them

 3    for; it is inviting them to submit some additional information

 4    about the specific projects, which the Department is reviewing

 5    as they come in and has already started to issue decisions on,

 6    that will allow for the continued extension of the liquidation

 7    period for these specific projects.  So whether and to what

 8    extent these states are truly foreclosed from accessing these

 9    funds for the projects that they're intending to undertake

10    remains an open question, at least until they submit those

11    extension requests and obtain a decision from the Department

12    on, you know, whether that liquidation period will in fact be

13    extended.

14            THE COURT:  So it remains an open question and is not,

15    as I believe you suggested earlier, well, you know, you can put

16    in your application, you can give reasons why an extension is

17    needed, and the likelihood is that yes, you will get

18    reimbursed.

19            MR. CONNOLLY:  You put in your application with

20    respect to a specific project and you seek an extension of the

21    liquidation period for that, and where the Department grants

22    that, then you have up until that new deadline to liquidate

23    funds relating to that project.  And then——

24            THE COURT:  Where the Department grants that, but what

25    about where the Department does not?
```

P561NYSA

1          MR. CONNOLLY:  Where the Department denies an

2     extension request, there is an administrative appeal option.

3     Within 30 days of that denial, you can appeal within the

4     Department for further consideration and can submit additional

5     information in support of your request for an extension of the

6     liquidation period with respect to that project.  And I believe

7     in our papers we cited to a Department of Education website

8     that is similar to the April 3rd letter but then builds off it,

9     providing additional information about the way the process

10     works and noting, as I believe the April 3rd letter does not,

11     the ability to appeal within the Department in the event that

12     an extension request is denied.

13          THE COURT:  Okay.

14          MR. CONNOLLY:  So because that remains an option for

15     states and because the possibility continues to exist for

16     states to obtain these extensions of the liquidation period,

17     the kind of just the precise issue that the plaintiffs are

18     challenging here is not one by which rights and obligations

19     have necessarily been determined.  Again, some states have

20     already applied for extensions of the liquidation period for

21     certain projects and have obtained them.  So now there's a

22     final agency action that allows them to continue to liquidate

23     those funds.  And for other states, that remains a possibility.

24          THE COURT:  Have any applications for extensions been

25     denied?

P561NYSA

```
1              MR. CONNOLLY:  There have been.  As I understand it,

2      your Honor, a set of applications have been determined at this

3      point.  Some projects have been approved for liquidation

4      extensions and others, yes, have been denied for extensions.

5              THE COURT:  Okay.

6              MR. CONNOLLY:  So in light of that flexible and

7      pragmatic inquiry, the rescission itself on the March 28th

8      letter of the prior extension should not be considered a final

9      agency action.  But to the extent that it were, it was not

10     arbitrary and capricious and it was also not contrary to law.

11     And perhaps I'll take those in reverse order.

12             First of all, with respect to contrary to law,

13     plaintiffs' argument is—

14             THE COURT:  I'm sorry.

15             MR. CONNOLLY:  Contrary to law.

16             THE COURT:  Contrary to law.

17             MR. CONNOLLY:  Pardon me.  Plaintiffs' argument is

18     that where Congress wanted appropriations to terminate with the

19     end of the public health emergency, it said so, and that's

20     true.  But what the Department is doing here is not terminating

21     these appropriated funds and it's not cutting off access for

22     the states to these appropriated funds.  Congress did—and we

23     explain this in our background section in our brief—it did

24     place at least initial time frames for when these appropriated

25     funds were supposed to be accessed, and beyond that, by
```

P561NYSA

1    regulation, the Department can extend those deadlines where

2    doing so is justified.  And it did that, and it is now

3    continuing to do that.

4           THE COURT:  Well, no.  It stopped it, and then it

5    created a different avenue for accessing those funds.

6           MR. CONNOLLY:  That is true.  I mean, a different

7    process for determining whether those extensions are justified.

8    But it's not contrary to the statute, or contrary to these

9    appropriations, because it's not actually terminating the

10   states' ability to access these funds.  It is simply

11   implementing a new procedure whereby states can continue to

12   access those funds, and there's nothing in any of these

13   appropriations that would preclude the Department from taking a

14   project-specific look and determining whether, you know,

15   extension of the liquidation periods is appropriate.

16          THE COURT:  Well, except that I'm told that the Senate

17   explicitly——I don't know what word to use here——directed,

18   encouraged, told, suggested——that the Department of Education,

19   in administering these funds, be flexible and be as minimally

20   intrusive into the states' ability to access these funds as

21   possible.  And that's not what this new process is doing, is

22   it?

23          MR. CONNOLLY:  Respectfully, your Honor, it's not as

24   intrusive as plaintiffs would suggest.  I mean, they talk about

25   like a six-part process, but really, most of those parts are

P561NYSA

1    just, you know, review within the Department to determine

2    whether to grant a liquidation extension.  For the states, you

3    see in the April 3rd letter, in many instances the kind of

4    basic information that they need to supply, as well as, to be

5    sure, an explanation of the specific project and why a further

6    extension is necessary.  But that's in keeping with the

7    Department's regulatory authority to grant these extensions

8    where they're justified.  And in the Department's view, given

9    the time that's elapsed since the end of the public health

10   emergency, it's appropriate to take a project-specific look at

11   where states are seeking further extension of the liquidation

12   period, and that is consistent with or certainly not

13   inconsistent with the language of the appropriations.

14         THE COURT:  And so the Department of Education changed

15   its mind.

16         MR. CONNOLLY:  The Department of Education changed its

17   mind, and it has the ability to do that.

18         THE COURT:  And when it does that, doesn't it have to

19   provide a reasoned explanation as to why it's changing its

20   mind?

21         MR. CONNOLLY:  It does, and that was what the March 28

22   letter did.

23         THE COURT:  Tell me how it did that.

24         MR. CONNOLLY:  The March 28th letter explained that in

25   light of the end of the public health emergency and in light of

1   the Department's priorities, it was, as a general matter, no

2   longer appropriate for extensions of these liquidation periods

3   to occur, but that states would be able to seek extensions of

4   those liquidation periods on a project-specific basis that

5   would allow the Department to evaluate the project in light of

6   Congress's goals in appropriating these funds.

7           THE COURT:  And is that reason sufficient on the facts

8   of this case?  And I say that because, to Mr. Amer's point,

9   yeah, the COVID emergency is over, but it was over two years

10  ago, and now all of a sudden they're saying, well, you know, we

11  shouldn't be using public funds in connection with a pandemic

12  that's almost two years old now.  And also, there's no talk of

13  this in any of the papers, but, I mean, implicit in these

14  programs, in these funding programs, is that I think——and you

15  can tell me if I'm wrong——that there was a loss in educational

16  attainment by all of these children occasioned by the pandemic

17  and the requirement that there be remote learning, if learning

18  there was taking place, and therefore implicit in the funding

19  was that of course it would go beyond the emergency because it

20  was only after the emergency that the school authorities would

21  have the opportunity to address that educational loss.

22          MR. CONNOLLY:  I agree that it was implicit that these

23  funds would continue to be available after the emergency, and

24  the Department is not preventing these funds from being

25  available after the emergency.  What the Department is doing is

P561NYSA

1    requesting project-specific information from states so that the

2    Department, at a more, I guess, granular level can determine

3    whether, given where we are vis-à-vis the pandemic and the end

4    of the public health emergency, the projects that the states

5    are seeking to undertake remain consistent with Congress's

6    goals in appropriating these funds.

7            THE COURT:  Okay.

8            MR. CONNOLLY:  The decision is also not arbitrary and

9    capricious.  The regulation at issue here, 2 C.F.R. 200.344(c),

10   specifies that the Department can grant extensions where it is

11   justified.  And again, that is what the Department is doing.

12   It is granting extensions here, where further extensions are

13   justified.  It has changed its procedures for doing that, but

14   the change in procedures is within the parameters of the

15   regulation and, again, not contrary to the appropriation

16   statutes themselves.

17           Turning to irreparable harm, here again, states can

18   and have obtained extensions of the liquidation period, so the

19   scope of the harm and whether and to what extent it is

20   irreparable remains at some level an open question.  To the

21   extent a state late last week received an extension of the

22   liquidation period with respect to a project, harms that it

23   thought might otherwise have been occasioned by the March 28th

24   letter, that calculus is different now, right?

25           THE COURT:  The disruption has already occurred,

P561NYSA

1    right?  You would agree with that.

2         MR. CONNOLLY:  The states have alleged——and again, we

3    have their complaint, we have their declarations——that there

4    has been disruption that has been occasioned by the March 28th

5    letter, yes.  But the question for the irreparable harm prong

6    is, you know, whether and to what extent the ability to obtain

7    a further extension of the liquidation period can act upon

8    those harms and prevent them from being irreparable, and there,

9    we submit——I mean, one thing that I think to note, your Honor,

10   is that in their declarations and in their opening brief, the

11   states don't address the extension, project-specific extension

12   process that was announced in the March 28th letter and then

13   discussed further in the April 3rd letter, and that does bear,

14   of course, on the nature of the harms and whether they're

15   irreparable.

16        THE COURT:  Well, I mean, they do discuss the

17   project-specific process now in place and say that it imposes

18   an additional burden.  You can argue about whether that's a

19   real burden or not, but they do address it.

20        MR. CONNOLLY:  Right.  They do.  Absolutely.  And

21   their second brief does address it.  But the question here is

22   whether and to what extent that process acts upon the harms

23   that they had otherwise articulated and can obviate those harms

24   through the ability to obtain those project-specific extensions

25   of the liquidation period.

P561NYSA

1          THE COURT:  Okay.

2          MR. CONNOLLY:  And finally, and briefly, your Honor,

3     the public interest and equities factors that are tied together

4     here.  The Department has the ability and there is a public

5     interest in making sure that these funds are spent consistent

6     with Congress's appropriations.  That's what the Department is

7     attempting to do here.  The language of both the March 28th and

8     April 3rd letters talks about asking the states for information

9     on how a particular project's extension is necessary to

10    mitigate the effects of COVID on American students' education.

11    The Department is receiving applications from states that speak

12    to that issue.  It is reviewing them in the process that's

13    described in the letters, and on their website, and it is in

14    the process of making those determinations and at times

15    granting those project-specific extensions of the liquidation

16    period.

17         THE COURT:  Could we go back to irreparable harm just

18    for a minute.

19         MR. CONNOLLY:  Certainly.

20         THE COURT:  You didn't mention whether or not the

21    federal government would be irreparably harmed if I were to

22    issue the injunction.  Would it?

23         MR. CONNOLLY:  Well, your Honor, I think the

24    potential——well, a couple things.

25              First of all, beginning with the public interest

P561NYSA

1  articulated, one potential harm here is that states will draw

2  down funds for projects that the Department, had it reviewed at

3  a project-specific level, would have determined might not have

4  qualified for the extension of the liquidation period.

5  THE COURT:  Okay.  But we're talking about

6  appropriated funds, correct?

7  MR. CONNOLLY:  These are appropriated funds, yes.

8  THE COURT:  So these funds were appropriated.  Initial

9  applications were made on particular projects and were granted,

10  right?  They were approved.

11  MR. CONNOLLY:  There was an initial project approval,

12  yes.

13  THE COURT:  And then there was a request for an

14  extension to complete those projects and they had to provide

15  additional information, and those extensions were approved

16  after careful consideration, correct?

17  MR. CONNOLLY:  As set forth in the complaint, correct.

18  THE COURT:  So how is the government irreparably

19  harmed by just allowing those determinations to stay in place

20  and projects to go forward?  They were appropriated funds.

21  MR. CONNOLLY:  Right.  I mean, the harm would be that

22  it would prevent the Department from doing what it has now

23  determined is appropriate to do, which is to review these

24  specific projects at a closer level to determine whether they

25  remain consistent with Congress's goals in appropriating the

P561NYSA

| 1 | funds.  In the event that preliminary injunction is entered, |

1    funds.  In the event that preliminary injunction is entered,

2    the process that has been stood up, these applications that the

3    Department is receiving, that would presumably all be put on

4    hold.  The Department would not be able to undertake the review

5    that it's undertaking subsequent to the March 28th letter.

6          Thank you, your Honor.

7          THE COURT:  Thank you.

8          Mr. Amer, did you want to respond?

9          MR. AMER:  I do have a few points, your Honor.  Thank

10   you.

11         Your Honor, you raised the question of whether there's

12   any guarantee that these specific project-specific extension

13   requests will be granted, and I think there was a suggestion

14   that they would likely be granted, and I want to put that to

15   rest based on what we know to date.

16         One of the plaintiff-states that did request some

17   project-specific extensions was Arizona, and this past Friday,

18   May 2nd, Arizona received A response by letter to their

19   extension requests.  And we have the letter.  I'm happy to file

20   it on the docket, your Honor, if you'd like to have the letter

21   on the record.

22         THE COURT:  Sure.  You can do that.

23         MR. AMER:  And there were $7.6 million, roughly, in

24   projects that were the subject of these project-specific

25   extension requests.  The Department approved only $1 million

P561NYSA

worth of these projects and denied $6.6 million worth of these
projects, so the vast majority of the project-specific
extension requests were denied.

But I think more telling, your Honor, is the reason
for why the projects were denied.  And I'm just going to quote
some of the explanations.

There's one project for about $1.2 million, and it was
denied for the following reason:  "This project is providing
resources to teachers rather than directly supporting students
academically."  That's the reason that that was denied.

For a $4.9 million project, the extension request was
denied for the following reason:  "While this project provides
services to students related to mitigating the effects of the
pandemic, it is focused on health rather than academics."  So
that's why that was denied.

Another reason for a roughly $450,000 project was:
"While this project provides support for mathematics teachers,
it does not provide services directly to students."

And then the fourth project that was denied for
roughly $110,000, the same reason as before:  "This project is
providing resources to teachers rather than directly supporting
students academically."

So these reasons that are being given have nothing to
do with whether additional time is needed to liquidate these
funds.  It's really seeking a complete redo of whether the

P561NYSA

1    funds should have been granted in the first place, and it's

2    completely contrary to what's provided for in the

3    appropriations statute.  If you just look at the American

4    Rescue Plan statute, it talks about, in Section 2001(e)(2),

5    what the uses of funds are that are permitted.  It clearly

6    includes professional development for staff, health-related

7    reasons, so——

8         THE COURT:  These were projects that presumably had

9    been previously approved.

10        MR. AMER:  Absolutely, because they were included with

11   the original grant application and they were part of the

12   extension request application.

13        So this additional process that is being imposed on

14   the states is just an effort to now apply new and different

15   criteria that actually runs contrary to what the appropriations

16   statute allows, and has absolutely nothing to do with whether

17   more time is needed or not.

18        And to your Honor's point about lost instruction time

19   and why you still need to provide this intervention to

20   students, I did want to mention that in the record——I'll just

21   read one of the paragraphs from the New York declaration,

22   paragraph 54 of Docket No. 26.  "Without an update or

23   confirmation that services will resume soon, our largest

24   educational service provider under EANS——" that's the program

25   for nonpublic schools "——who provides, among other things,

P561NYSA

| | |
|---|---|
| 1 | tutoring services, plans to terminate all employees that they |
| 2 | currently have furloughed.  If US DOE is not immediately |
| 3 | required to withdraw the March 28 rescission, there will not be |
| 4 | enough time to hire new staff and get the programs back up and |
| 5 | running for the remainder of the 2024-25 academic year.  This |
| 6 | will result in severe harm to students, including lost |
| 7 | instruction time and further lost opportunities to address |
| 8 | learning losses and gaps that were the result of the |
| 9 | pandemic——problems the ARP funding was specifically targeted to |
| 10 | alleviate." |
| 11 | I think that gets right at your Honor's point.  And |
| 12 | it's not just in the complaint.  This is the declaration that |
| 13 | New York submitted, so it's in the record as evidentiary |
| 14 | material. |
| 15 | I think just one last point——well, on that——is that |
| 16 | providers of these programs and services know about the |
| 17 | March 28th letter, and they know about the April 3rd letter, |
| 18 | and they know about this process for submitting |
| 19 | project-specific extensions, and they're still not willing to |
| 20 | continue performing under these contracts.  So they understand |
| 21 | that this additional process for getting project-specific |
| 22 | extensions doesn't suggest in any way, shape, or form that the |
| 23 | funds are going to start flowing again, and once these letters |
| 24 | like this May 2nd letter that I read from become public, it |
| 25 | will cement the understanding that much of these funds are |

P561NYSA

1    going to be yanked and won't be approved.

2          THE COURT:  Can you, for the record, just indicate to

3    whom that letter is addressed and who sent the letter.

4          MR. AMER:  Yes.  So it's on United States Department

5    of Education letterhead.  It's dated May 2, 2025.  So it was

6    this past Friday.  It's to the Honorable Tom Horne, H-O-R-N-E,

7    State Superintendent of Public Instruction, Arizona Department

8    of Education, and it's signed by Hayley, H-A-Y-L-E-Y, W. Sanon,

9    S-A-N-O-N.  He's the Principal Deputy Assistant Secretary and

10   Acting Assistant Secretary in the Office of Elementary and

11   Secondary Education of the U.S. Department of Education.  So we

12   will file that later today with a cover letter, your Honor.

13         Finally, I think my friend mentioned that the harm

14   that the Education Department suffers is the harm due to the

15   fact that had it reviewed the extension requests on a

16   project-specific basis, it would have been denied because it

17   would have been given an opportunity to have a closer look.  I

18   don't think there's any record evidence that suggests that the

19   look that the Department previously gave to these projects,

20   either when the applications for the grant money was originally

21   submitted or when the extension requests were previously

22   reviewed and approved, was anything other than a close look, so

23   the idea that the Department is somehow being deprived, if this

24   Court grants the injunction, of an opportunity to take a close

25   look at these projects I think is contrary to what's in the

P561NYSA

1    record.  I think the record suggests that these projects were

2    specified in the prior grant applications and in the prior

3    extension requests, that they were looked at, and I think your

4    Honor even asked my friend whether there's any suggestion here

5    that the Department didn't give those a close look.  So I think

6    what the Department is saying is that the harm is not doing

7    something that they actually already did.  And that's not harm

8    at all, your Honor.

9              THE COURT:  Can I ask if you could speak to the issue

10   of whether or not this is a final order, the March 28 letter.

11             MR. AMER:  It's absolutely a final order because

12   there's no reconsideration suggested on the blanket decision to

13   rescind all of the extension approvals.  That's not anything

14   that's being looked at today by the Department.  The letter was

15   clear, if you look at the language of the letter, that it's

16   effective immediately, the extension approvals are being

17   rescinded, it's being modified to expire as of 5 p.m. on

18   March 28th.  There's no tentative nature with respect to that

19   decision, so it's absolutely final.  And again, under

20   Section 704, even if the Department did say, you know, we'll

21   reconsider this rescission, as long as they make the rescission

22   operable effective immediately, it's final under the APA.

23             THE COURT:  Thank you.

24             MR. AMER:  Thank you, your Honor.

25             THE COURT:  Okay.  I am going to issue the preliminary

P561NYSA

 1    injunction, and we'll talk in a little bit about whether or not

 2    I should require the posting of a bond or whether I should stay

 3    this determination.  But first of all, I do find that the

 4    plaintiffs are seeking a prohibitory and not a mandatory

 5    injunction.  As they indicate, the last peaceable status in

 6    this case was just prior to the time that Secretary McMahon's

 7    letter of March 28 was issued, and at that time the extensions

 8    were in place.  Those extensions were rescinded, and

 9    accordingly, this is a prohibitory injunction.

10        I further find preliminarily that this is a final

11    order.  As Mr. Amer indicated, a decision was made to rescind

12    all extensions.  There was no equivocation in that

13    determination, and it is operable, which is to say that the

14    states are required to abide by it, and presumably if they were

15    to put in a request for reimbursement today, outside of the new

16    process that has been set up for these funds, it would be

17    rejected out of hand.

18        I find that the plaintiffs have established a

19    likelihood of success on the merits on both of their causes of

20    action with respect to arbitrary and capricious.  The

21    Department of Education changed its mind.  I find that the

22    reason proffered was not a reasonable explanation.  As we have

23    discussed, Congress intended that these funds be made available

24    to school districts and schoolchildren.  There was no reason

25    other than the fact that the COVID emergency had ended some two

P561NYSA

1   years before.  However, clearly, the purpose of the funding

2   sources of the acts that provided the funding was so that there

3   can be funding for these programs going forward after the

4   pandemic emergency was deemed to have ended in order to account

5   for the loss of educational attainment that schoolchildren had

6   suffered as a result of remote learning and other difficulties

7   attendant to the COVID-19 pandemic.

8           And with respect to contrariness to law, as we

9   discussed, Congress intended that these funds remain available.

10  Congress intended that the Department of Education be liberal

11  and flexible in making sure that these programs continued to be

12  funded, and that the Department of Education not impose

13  unreasonable obstacles in the way of state agencies looking to

14  continue to fund those programs.  As a result of the

15  Department's actions, the plaintiffs have established

16  irreparable harm.  There are any number of declarations that

17  have been submitted that talk about the disruption that has

18  been caused by the March 28 letter——programs have been halted,

19  staff has been laid off, infrastructure projects that were

20  begun had been halted midstream, causing unusable locations

21  within schools.

22          On the other hand, there's nothing before me to

23  suggest that the government would be irreparably harmed in any

24  way by the issuance of the preliminary injunction.  These are

25  funds that have been appropriated for particular uses.

P561NYSA

 1    Applications were made and approved with respect to those uses.

 2    Applications were made and approved with respect to extending

 3    the drawdown of those funds.  There were substantial reliance

 4    rights that were established by the plaintiffs, which obviously

 5    were interrupted.

 6         And again, the public interest and the balance of

 7    hardships here weigh clearly in favor of the plaintiffs, who

 8    have had to disrupt the provision of educational services to

 9    schoolchildren, who have had to halt infrastructure projects

10    midstream because of the Department of Education's

11    determination, and for all those reasons, the plaintiffs have

12    clearly met all of the elements for the issuance of a

13    preliminary injunction, and one will be issued.

14         I will be signing the form preliminary injunction that

15    was provided by the plaintiffs.

16         But let's talk about a bond and a stay.  Mr. Amer?

17         MR. AMER:  Thank you, your Honor.

18         We do address the bond requirement in point 4 of our

19    reply brief.  Obviously, as the Court is aware, there needs to

20    be a specific finding in the preliminary injunction order,

21    which can be done orally, obviously, today.

22         We do think there's no dispute that the Court has wide

23    discretion in setting the bond amount, including setting the

24    bond amount at 0.  I think we're talking about whether the bond

25    should be 0 up to $10,000, which is the nominal sum that the

P561NYSA

1   defendants have requested.  We think it makes sense for the

2   amount here to be set at 0 because of the various reasons we

3   highlight in our brief——namely, that here, this is a situation

4   where we're seeking to enforce public interests arising out of

5   a comprehensive federal health and welfare statute.  Second

6   Circuit has noted that that is a sufficient justification to

7   set the bond at 0.  Also, because there is no proof here of

8   likelihood of harm to the defendants as a result of the

9   preliminary injunction, which is one of the findings your Honor

10   just made; that's another reason for justifying a bond at 0.

11   And finally, we think that where the likelihood of success is

12   so strong as it is here, that's another reason for setting the

13   bond at 0.  And we would ask, therefore, that the Court set the

14   bond at 0.

15          I'd also mention that there are any number of cases

16   that have been decided within the last couple of months where

17   there have been challenges to this administration's agencies'

18   actions where bonds have been set at 0.

19          I thank you, your Honor.

20          THE COURT:  Mr. Connolly, did you wish to be heard?

21          MR. CONNOLLY:  Sure.  Just briefly, your Honor, on the

22   bond.

23          Obviously, Federal Rule of Civil Procedure 65(c)

24   provides that the Court may issue a preliminary injunction only

25   if the movant gives security in an amount that the Court

1   considers proper.  Here, we are simply asking, in accordance

2   with that rule, for the entry of a de minimis bond of $10,000.

3          Would your Honor like me to address the appellate

4   issue as well?

5          THE COURT:  Let me just deal with the bond.

6          I'm not going to require the issuance or the posting

7   of a bond.  As we've discussed, I find that the plaintiffs have

8   established a likelihood of success on the merits that is

9   greater than usual, perhaps even overwhelming.  In fact, I was

10  going to discuss whether the showing that the states have made

11  would have been enough even to satisfy the test of a mandatory

12  injunction.  So I do find that their likelihood of success on

13  this case is strong.  And as we have been discussing, this case

14  involves the enforcement of public interest arising out of a

15  comprehensive federal health and welfare statute.  So I will

16  not require the posting of a bond.

17         On the issue of the appeal, a stay pending appeal,

18  Mr. Connolly, I'm happy to hear you.

19         MR. CONNOLLY:  Certainly, your Honor.

20         The government will confer in light of the Court's

21  ruling.  As your Honor knows, decision whether or not to appeal

22  rests with the Solicitor General.  We would ask that in the

23  event the Solicitor General determines to appeal your Honor's

24  ruling, that the Court stay the preliminary injunction pending

25  a disposition of that appeal.  And obviously in the event that

P561NYSA

```
 1    decision is made, we can provide further information in a

 2    letter to the Court, but we would be asking for a stay if an

 3    appeal is authorized.

 4              THE COURT:  Thank you.  Mr. Amer?

 5              MR. AMER:  Your Honor, we don't think that there is a

 6    need for this Court to issue a stay.  This is not a situation

 7    that involves any exigency.  There are no planes on the tarmac

 8    about to take off.  There is going to be a process where the

 9    states now submit their payment requests as timely requests as

10    a result of the injunction, the defendants will have an

11    opportunity to review those timely requests, and in the

12    interim, they certainly have time to go to the Second Circuit

13    and seek whatever relief by way of a stay that they feel is

14    necessary.

15              THE COURT:  I will not be staying the implementation

16    of the preliminary injunction.

17              Is there anything else that we should discuss today,

18    Mr. Amer?

19              MR. AMER:  Nothing from the plaintiffs.  Thank you

20    very much.

21              THE COURT:  Mr. Connolly?

22              MR. CONNOLLY:  No.  Thank you, your Honor.

23              THE COURT:  Okay.  In that event, we are adjourned.

24    We'll be issuing the injunction and posting it on ECF.

25              Thank you all for your very, very helpful arguments.
```
                                o0o